5 F.3d 1383
 62 USLW 2260
 CHABAD-LUBAVITCH OF GEORGIA, Yossi New, Rabbi, Yossi Lerman,
Rabbi, Plaintiffs-Appellants,
v.
Zell MILLER, Governor of Georgia, Michael J. Bowers,
Attorney General of Georgia, Luther Lewis, Acting Director,
Georgia Building Authority, Max Cleland, Secretary of State
of Georgia, Defendants-Appellees.
 No. 92-8008.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 18, 1993.
 
 Nathan Lewin, Stuart A. Levey, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, DC, for plaintiffs-appellants.
 Ray O. Lerer, Sr. Asst. Atty. Gen., Atlanta, GA, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, and CARNES, Circuit Judges.
 TJOFLAT, Chief Judge:
 
 
 1
 In this case, a state refuses to allow a religious group to erect and maintain a religious display in a public forum within a core government building for the duration of an eight-day religious holiday. The state claims that the Establishment Clause of the First Amendment, which prohibits it from establishing a religion, requires that it deny the group's request. The religious group, contending that the state's refusal denies the group's First Amendment right of free speech, seeks an injunction requiring the state to allow the display.
 
 
 2
 The district court concluded that the state had a compelling interest in avoiding an Establishment Clause violation, and it therefore denied the religious group's application for injunctive relief. We conclude that no such interest is present in this case. Although the state has a compelling interest in avoiding violations of the Establishment Clause, granting the group's request to maintain its display in the public forum at hand will not convey the message that the state is endorsing, and thus establishing, the group's religion. Accordingly, we reverse.
 
 I.
 
 3
 Appellants are Chabad-Lubavitch of Georgia (Chabad) and Rabbis Yossi New and Yossi Lerman, both of whom are members of Chabad. Chabad is the local affiliate of Chabad-Lubavitch, a nonprofit religious organization with offices throughout this country and around the world. Chabad-Lubavitch seeks to minister to the needs of the Jewish community; its primary goal is to reawaken Jews' interest in their Jewish heritage.
 
 
 4
 In 1989, Chabad sought and obtained permission from the Georgia Building Authority and the Governor's office to erect and maintain a Chanukah menorah[1] on the plaza[2] in front of the State Capitol Building during the eight-day celebration of Chanukah. During that period, Chabad continuously displayed its privately owned, fifteen-foot tall, stainless steel menorah on the plaza. A bright yellow sign proclaiming "HAPPY CHANUKAH from CHABAD OF GEORGIA" accompanied the menorah. In addition, at sundown each day, Chabad conducted a forty-five minute candle-lighting ceremony. Other than during this ceremony, no Chabad representative stayed with the menorah.
 
 
 5
 In October 1990, Chabad again sought permission to erect and maintain its menorah and accompanying sign on the plaza during Chanukah. The Governor's office responded by informing Chabad that permission to erect the menorah would turn on the Georgia Attorney General's forthcoming opinion letter on the constitutional implications of Chabad's intended menorah display.
 
 
 6
 The Attorney General's opinion letter issued on November 30, 1990, and concluded that allowing Chabad's intended eight-day display would violate the Establishment Clause of the First Amendment.[3] On December 3, the Governor's office denied Chabad's request to display the menorah. The office indicated, however, that Chabad could conduct a candle-lighting celebration on December 18, the last night of Chanukah, if Chabad removed the menorah from the plaza following the ceremony.
 
 
 7
 With Chanukah to begin at sundown on December 11, 1990, Chabad brought this suit on December 7 against the Governor, the Attorney General, the Secretary of State of Georgia, and the Acting Director of the Georgia Building Authority (collectively "Georgia" or the "State"). Alleging that Georgia's denial of its request to erect and maintain a menorah on the plaza in front of the Capitol Building for the duration of Chanukah violated its First Amendment right of free speech,[4] Chabad sought preliminary and permanent injunctive relief requiring the State to allow the display.[5]
 
 
 8
 On filing its complaint, Chabad applied for a temporary restraining order (which, if issued, would in effect grant the organization a preliminary injunction). On December 11, the district court denied Chabad's application. In its dispositive order, the district court found that, although Chabad had a First Amendment right to exhibit the menorah on the plaza because the plaza is a public forum, its right was subject to the Georgia Building Authority's content-neutral restrictive-use policy, which prohibits private citizens from placing objects, such as the menorah, on public property, such as the plaza. See Chabad, 752 F.Supp. at 1066-68. Chabad appealed and immediately moved this court to grant the coercive relief the district court had denied. We declined to grant the relief, and Chabad dismissed its appeal.
 
 
 9
 On January 9, 1991, Chabad requested permission from the Governor's office to place a menorah either on the plaza in front of the Capitol Building or inside the Capitol Rotunda for the duration of Chanukah 1991. The Rotunda is an open space under the dome in the center of the Capitol Building.
 
 
 10
 Over the past decade, Georgia has opened the Rotunda to Georgia's citizenry for their expressive activities both secular and religious in nature. Secular programs that have taken place in the Rotunda include a Mental Health Awareness event, a "Just Say No" event, a National Organization for the Reform of Marijuana Laws press conference, a Georgia Family Council news conference, a "Parental Notification" group press conference, and a "Georgia Rights to Abortion" press conference. Religious programs held in the Rotunda have included invocations by a Methodist minister at the annual presentation of a state-sponsored Christmas tree and two Holocaust Commemoration ceremonies with religious benedictions. Additionally, certain groups have erected and maintained unattended displays in the Rotunda for various periods of time, including an eighteen-foot tall Indian Wattle and Daub Hut during the annual Indian Heritage Week (five days), a forty-one poster exhibit sponsored by the Atlanta Jewish Federation (eight days), and a thirty-five flag exhibit during "International Week" (five days). As the district court subsequently found, Georgia has permitted these and other cultural, educational, historical, and religious events to take place in the Rotunda pursuant to a "content-neutral, equal access policy ... on a first-come, first-serve basis to all interested parties." Chabad-Lubavitch of Ga. v. Miller, 976 F.2d 1386 app. at 1390 (11th Cir.1992).
 
 
 11
 On April 25, 1991, Chabad, having received no response to its January 9 request, amended, with leave of court, the complaint it had filed on December 7, 1990. The amended complaint presented two First Amendment claims for injunctive relief. In count I, Chabad asked the court to require the State to allow it to display its menorah for the duration of Chanukah 1991 on the plaza in front of the State Capitol Building; in count II, Chabad asked for the same relief in the Rotunda of the Capitol Building.
 
 
 12
 On November 7, 1991, Chabad moved for summary judgment on count II.[6] The next day, Georgia moved for summary judgment on both counts. On December 5, 1991, the district court, concluding that concern for violating the Establishment Clause gave the State a compelling (and thus valid) reason for denying Chabad's request, granted Georgia's motion for summary judgment.[7] Chabad immediately appealed, challenging the district court's disposition of count II. A divided panel of this court affirmed, adopting, in full, the district court's order granting summary judgment. Chabad-Lubavitch of Ga. v. Miller, 976 F.2d 1386 (11th Cir.1992). On April 5, 1993, we granted Chabad's petition for rehearing en banc. Chabad-Lubavitch of Ga. v. Miller, 988 F.2d 1563 (11th Cir.1993).
 
 II.
 
 13
 The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Religious speech enjoys sanctuary within the First Amendment. See Widmar v. Vincent, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) ("[R]eligious worship and discussion ... are forms of speech and association protected by the First Amendment."). The Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). Our sister circuits have recognized as a matter of course that displaying a religious symbol is protected speech under the First Amendment. See, e.g., Kreisner v. City of San Diego, 988 F.2d 883, 891 (9th Cir.1993); Americans United for Separation of Church and State v. City of Grand Rapids, 980 F.2d 1538, 1542 (6th Cir.1992) (en banc ); Doe v. Small, 964 F.2d 611, 618-19 (7th Cir.1992) (en banc ); cf. Johnson, 491 U.S. at 406, 109 S.Ct. at 2540 (burning American flag is protected speech under the First Amendment); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (wearing a black armband is protected speech). We agree.
 
 
 14
 The district court properly identified Georgia's exclusion of Chabad's menorah display from the Rotunda as based solely upon the religious content of Chabad's speech. A state's content-based exclusion of a display from a public forum is permissible only if the exclusion withstands strict scrutiny review. See United States v. Kokinda, 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) ("Regulation of speech on property that the Government has expressly dedicated to speech activity is ... examined under strict scrutiny."). Under strict scrutiny, we cannot countenance Georgia's exclusion of Chabad's display from the Rotunda unless Georgia can demonstrate that the exclusion is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Burson v. Freeman, --- U.S. ----, ----, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992). Georgia satisfies neither standard of strict scrutiny.
 
 
 15
 In subpart A, we demonstrate that Georgia has failed to articulate a compelling state interest in excluding the menorah from the Rotunda. In particular, we observe that Georgia's claim that it must exclude Chabad's display to avoid an Establishment Clause violation improperly gives short shrift to the Rotunda's status as a public forum. In subpart B, we briefly note that even if Georgia does have a compelling state interest in excluding the menorah from the Rotunda, total exclusion is not narrowly tailored to achieve that interest.
 
 A.
 
 16
 To satisfy the first standard of strict scrutiny, Georgia must demonstrate that exclusion of Chabad's menorah display from the Rotunda serves a compelling state interest. Georgia advances only one such interest, to wit, avoiding a violation of the Establishment Clause of the First Amendment. See Widmar, 454 U.S. at 271, 102 S.Ct. at 275 ("[T]he interest of the [state] University in complying with its constitutional obligations [under the Establishment Clause] may be characterized as compelling."). But see Kreisner, 988 F.2d at 892 (suggesting that the Widmar Court "raised, but never resolved, the question whether avoiding an Establishment Clause violation provides a compelling state interest justifying a content-based restriction on speech in a public forum").
 
 
 17
 To determine whether Georgia would violate the Establishment Clause by allowing Chabad to display its privately owned menorah in the Rotunda, a public forum located in a core government building, we turn to the test established in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Although that test has been criticized severely,[8] it still controls our Establishment Clause inquiry. See Lamb's Chapel, --- U.S. at ---- n. 7, 113 S.Ct. at 2148 n. 7 (noting that Lemon yet survives); Lee v. Weisman, --- U.S. ----, ----, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (declining invitation to reconsider Lemon ).
 
 
 18
 To fit this case within Lemon 's construct, we must identify precisely what government "action" would be responsible for Chabad's speech (if allowed) and then ascertain whether that action would pass constitutional muster. As a matter of course, Georgia grants private speakers equal and unimpeded access to the Rotunda, a designated public forum. Its citizens may come and go, speak and listen, applaud and condemn, and preach and blaspheme as they please.[9] Georgia neither approves nor disapproves such conduct, no matter how sordid or controversial it might be. Instead, the state remains aloof; it is neutral toward, and uninvolved in, the private speech.
 
 
 19
 Chabad seeks access to the Rotunda for its private religious speech pursuant to a neutral open-access policy; it does not seek a special state-granted dispensation. In no way does Georgia seek to exhibit the display on its own behalf; it neither solicits the display nor provides Chabad with preferential treatment. In sum, Georgia neutrally opens the Rotunda as a public forum available to all speakers, and Chabad seeks to exercise its constitutional right to speak in that public forum. Therefore, the state "action" that we must review under the Lemon test is the granting of Chabad's request pursuant to the neutral open-access policy.
 
 
 20
 Having identified the state action that would be responsible for Chabad's speech, we must now determine, under Lemon, whether Georgia would contravene the dictates of the Establishment Clause if it allowed Chabad to exhibit its menorah in the Rotunda during Chanukah. The Lemon test instructs that Georgia would violate the Establishment Clause if such action (1) lacked a secular purpose, (2) had the primary effect of advancing or inhibiting religion, or (3) fostered excessive state entanglement with religion. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111. We conclude that, pursuant to its neutral open-access policy, which would allow Chabad to disseminate its private message on the same terms as Georgia allows other speakers to disseminate theirs, Georgia may grant Chabad's request for access to the Rotunda. Below, in subpart 1, we consider the first and third prongs of the Lemon test; in subpart 2, we address the second.
 
 1.
 
 21
 Georgia properly does not suggest that it would breach either the first or the third prong of the Lemon test by allowing the Chanukah menorah display in the Rotunda. Georgia would not violate the first prong of the test because its neutral treatment of Chabad's display would advance the secular purpose of providing an arena for its citizenry's exercise of the constitutional right to free speech. See Widmar, 454 U.S. at 271, 102 S.Ct. at 275 (noting with approval that the district and appellate courts held that "an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose"); cf. Lynch, 465 U.S. at 680, 104 S.Ct. at 1362 ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations.").
 
 
 22
 Similarly, Georgia would not violate the third prong of the Lemon test because allowing the menorah display in no way would entangle the State with religion. Georgia's open access policy precludes the State from making religion-based inquiries--such as, for example, determining what constitutes religious speech--which might engender the state entanglement with religion that the Establishment Clause obligates Georgia to avoid. Indeed, Georgia would risk entanglement by excluding certain speech on the ground that it is religious. See Widmar, 454 U.S. at 271-72 & n. 11, 102 S.Ct. at 275 & n. 11 (greater risk of entanglement through exclusion of religious speech from public forum). Part of the majesty of the public forum is that it insulates the government from the necessity of scrutinizing the content of the citizenry's speech. Through a broad policy of content-neutral inclusion, the public forum is uniquely situated to avoid the need for the State to make religion-based exclusionary judgments and therefore risk unconstitutional entanglement with religion.
 
 2.
 
 23
 Georgia concentrates its attention on the second prong of the Lemon test and argues that allowing Chabad to display a menorah in the Rotunda for the eight days of Chanukah would have the primary effect of advancing religion. In Allegheny, the Supreme Court breathed some content into Lemon 's second prong. The Court explained that "[s]ince Lynch, the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must determine whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their religious choices.' " 492 U.S. at 597, 109 S.Ct. at 3103 (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)).
 
 
 24
 a.
 
 
 25
 Georgia contends that it would create the constitutionally impermissible perception that it endorsed a religion if it allowed Chabad to display a menorah in the Rotunda.[10] As it was with the Allegheny Court, "our present task is to determine whether the display of ... the menorah, in [its] 'particular physical setting[ ],' [would create] the effect of endorsing or disapproving religious beliefs." 492 U.S. at 597, 109 S.Ct. at 3103. In this case, the particular physical setting in which Chabad intends to display its Chanukah menorah is a public forum located in a core government building.
 
 
 26
 In Allegheny, the Court held that, by permitting a Roman Catholic group's display of a creche, a religious symbol, on the Grand Staircase of the County Courthouse, "the 'main' and 'most beautiful part' of the building that is the seat of county government," 492 U.S. at 599, 109 S.Ct. at 3104, the county unmistakably conveyed a message that it endorsed the creche's religious message and, thereby, violated the Establishment Clause. Georgia argues, and the district court held, that Allegheny controls the outcome of this case. This argument is not without some illusory appeal. Arguing from ostensibly close analogy, Georgia contends that it too would violate the Establishment Clause by permitting Chabad, a Jewish group, to display its menorah, a predominantly religious symbol, in the Capitol Rotunda, a core government building.
 
 
 27
 Allegheny, however, has next to nothing to do with this case.[11] Allegheny is not a public forum case. This case is. The Allegheny Court expressly indicated that its analysis was distinct from that employed in public forum cases like Widmar v. Vincent. Allegheny, 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50.[12] Conversely, the district court found it "patently clear that the State of Georgia has designated the Rotunda as a limited public forum."[13] The parties do not dispute this finding.[14] Thus, we must apply the Supreme Court's public forum jurisprudence to determine whether Georgia would violate the Establishment Clause by allowing Chabad to display its menorah in the Rotunda. See Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. at 955 (a designated public forum is governed by "the same standards as apply in a traditional public forum."); cf. id. ("Public property which is not by tradition or designation a forum for public communication is governed by different standards."). The Rotunda's status as a true public forum fundamentally defines the constitutional analysis.
 
 
 28
 b.
 
 
 29
 Having determined that public forum analysis is appropriate in this case, we must resolve whether Georgia would violate the Establishment Clause by allowing Chabad access to the Rotunda. In Widmar, the Court considered whether a state university could exclude a registered religious student group from the university's facilities that were generally available to other registered student groups. The university contended that the Establishment Clause compelled the exclusion of the religious student group. The Court disagreed. It identified two factors that were "especially relevant" to its conclusion that the Establishment Clause would not be violated.
 
 
 30
 The first factor questioned whether religious speech in a public forum confers the state's stamp of approval on religion. The Court held that it did not, finding that "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." Widmar, 454 U.S. at 274, 102 S.Ct. at 276. Similarly, in Board of Educ. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), the Court explained that the failure to censor is not synonymous with endorsement. "[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Id. at 250, 110 S.Ct. at 2372. Indeed, the very nature of a public forum is such that state approval does not attach to the various forms of speech (religious or otherwise) communicated therein. See id. at 248, 110 S.Ct. at 2371 ("[T]he message [of inclusion] is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion."). Pursuant to its policy of equal access to the public forum, Georgia may allow, without endorsing, private religious speech in the Rotunda.
 
 
 31
 The second factor questioned whether the public forum was widely available to private speakers. The Court found it significant that "the forum [was] available to a broad class of nonreligious as well as religious speakers," 454 U.S. at 274, 102 S.Ct. at 277, and was "unpersuaded that the primary effect of the public forum, open to all forms of discourse, would be to advance religion," id. at 273, 102 S.Ct. at 276. In this case, the district court found that the Rotunda is available to, and has been used by, a diverse set of secular and religious groups.[15] This fact, the essence of a public forum, is not lost on the reasonable observer.
 
 
 32
 To a reasonable observer, no display actually stands alone in [a] public forum. In the mind's eye, the reasonable observer sees the menorah display as but one of a long series that has taken place since the [forum] was opened. The reasonable observer knows that other speakers have used the [forum] before, and will do so again. Instead of concluding that religious zealots have stormed the gates with the city's endorsement, the reasonable observer recognizes this display as yet another example of free speech.
 
 
 33
 Americans United, 980 F.2d at 1549. The speech that takes place in a public forum belongs and can be attributed to the private speaker only; neither approbation nor condemnation of the private speaker's message may be imputed to the state. See id. at 1553 ("truly private religious expression in a truly public forum cannot be seen as endorsement by a reasonable observer"); cf. Kreisner, 988 F.2d at 891 ("Religious speakers have the same right of access to public forums as others."). Consequently, Georgia, having freely opened the Rotunda to all types of speakers, would not violate the Establishment Clause by allowing private religious speech in the Rotunda.
 
 
 34
 More recently, the Supreme Court reaffirmed Widmar 's reasoning and conclusion as sound. In Lamb's Chapel, the Court held that the state's denial of an evangelical church group's request for access to public school premises to exhibit a film that "appeared to be church related" violated the church group's rights under the Free Speech Clause, and that permitting access would not have been an unconstitutional establishment of religion. --- U.S. at ----, 113 S.Ct. at 2149. The Court explained that it had
 
 
 35
 no more trouble than did the Widmar Court in disposing of the claimed defense on the ground that the posited fears of an Establishment Clause violation are unfounded. The showing of this film would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members. The District property had repeatedly been used by a wide variety of private organizations. Under these circumstances, as in Widmar, there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental. As in Widmar, ... permitting District property to be used to exhibit the film involved in this case would not have been an establishment of religion under the three-part test articulated in Lemon v. Kurtzman....
 
 
 36
 Lamb's Chapel, --- U.S. at ----, 113 S.Ct. at 2148. Thus, despite Georgia's protestations to the contrary, it would not violate the Establishment Clause by allowing Chabad access to the Rotunda.
 
 
 37
 c.
 
 
 38
 The analysis that courts must bring to bear on the interplay between the Free Speech Clause and the Establishment Clause in the public forum context is somewhat curious in that the existence of the public forum initially implicates the Free Speech issue and ultimately determines the Establishment Clause issue. Once the state creates a public forum, it may only exclude a private party's religious speech within the forum--a content-based restriction on speech--if the exclusion survives strict scrutiny review, that is, if the restriction is narrowly tailored to serve a compelling state interest.
 
 
 39
 In those public fora cases, the state--as it has here--will interpose as a compelling state interest the need to avoid a violation of the Establishment Clause and will argue that permitting the religious speech may send a constitutionally impermissible message of state endorsement. This might be true if the private party communicated the religious speech on government property that was not a true public forum. Precisely because the religious speech is communicated in a true public forum, however, the state, by definition, neither endorses nor disapproves of the speech. By permitting religious speech in a public forum--whether in the heart of a core government building, in the Georgia Governor's mansion, or in the outer reaches of some state-owned pasture--the state simply does not endorse, but rather acts in a strictly neutral manner toward, private speech. See Kreisner, 988 F.2d at 895 ("The public forum doctrine would be rendered meaningless if only places in the middle of nowhere could be free speech areas, and if all speech that occurred near 'structural symbols of government' had to be viewed as government speech."); id. at 894 ("In any event, even the proximity of buildings of unmistakably governmental character is a patently imperfect proxy for attributing speech that goes on there to the government."); Doe, 964 F.2d at 630 (Easterbrook, J., concurring) ("That a public forum may be close to city hall cannot matter; any forum open to secular speech must be open to religious speech.").[16] The whereabouts of public fora matter only to the extent that satisfaction of the state's burden of familiarizing the public with the nature of public fora (and the state's corresponding neutrality) may vary in difficulty. The public may be less inclined to attribute private speech to the government when the speech is communicated in a public park rather than, as here, in a core government building.
 
 
 40
 Before it establishes a public forum, the state should take many factors into account, including the difficulty of maintaining a public forum and educating the public about its attributes. The state controls its property and is under no obligation to designate as public fora locations that traditionally are not. See Perry Educ. Ass'n, 460 U.S. at 46, 103 S.Ct. at 955. The state would be well advised to refrain from dedicating a public forum in a location that it believes the public inextricably associates with state authority such that the public would be unable to distinguish private speech in that location from state-sanctioned speech.
 
 
 41
 Once the state decides to designate a public forum, however, the monkey is on the state's back. The state shoulders the burden of surmounting the public's perception of the intrinsically governmental character of a public forum located, as here, in a core government building. See Doe, 964 F.2d at 630 (Easterbrook, J., concurring) ("A government's obligation to dissipate any mistaken impression of sponsorship that it has induced is its own burden, and laxity in discharge of public duties is no justification for curtailing private speech."); cf. Kreisner, 988 F.2d at 898-99 (Kozinski, J., concurring) ("I can't see how the fear that someone might--mistakenly--think the government is endorsing religious speech is a better justification for censorship than those rejected in these cases [racist speech, advocacy of Communism, pornography] and countless others."). If the state is concerned that those who hear or view the private religious speech may not appreciate the strictly private nature of the speech, the state has the burden of informing the public that speech in a public forum does not enjoy state endorsement.
 
 
 42
 The state cannot constitutionally penalize private speakers by restricting either their right to speak or the content of their speech simply because the state exhibited dubious wisdom in creating, or has been slovenly in its maintenance of, its public fora. See Perry Educ. Ass'n, 460 U.S. at 45-46, 103 S.Ct. at 955 ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."). Any perceived endorsement of religion in a true public forum is simply misperception; the Establishment Clause is not, in fact, violated. Doe, 964 F.2d at 629 (Easterbrook, J., concurring) ("[R]eligious speech may not be excluded from public forums just because passersby misunderstand the public role.").[17] We refuse to strip Georgia's citizens of their constitutionally guaranteed right to speak simply because the State has not taken steps to disabuse the uninformed or unreasonable of an erroneous attribution of private religious speech to the State. It is Georgia's responsibility to ensure that reasonable observers of Chabad's menorah display do not mistakenly believe that Georgia endorses Judaism.
 
 
 43
 If Georgia fears that it would violate the Establishment Clause by allowing the display, it can avoid the perception that it is endorsing a religion by (1) closing the forum altogether, (2) posting signs to explain the nature of the public forum, or (3) enacting time, place, and manner restrictions governing the form of presentations in the Rotunda. Consequently, Georgia, having complete control over the perception it might create in this case, can satisfy the Establishment Clause's requirements without foreclosing Chabad's speech.
 
 
 44
 Georgia, however, has chosen to forego these options and instead to silence Chabad's speech because of its religious content. In other words, Georgia has relied on the Establishment Clause as a justification for denying Chabad's right of free speech. In a true public forum, such as the Rotunda, the Establishment Clause cannot be used as a justification for content-based restrictions on religious speech.
 
 B.
 
 45
 Even if Georgia did have a compelling state interest in excluding Chabad's religious speech from the Rotunda--a counterfactual supposition--Georgia's action would still fail strict scrutiny. To satisfy the second standard of strict scrutiny, Georgia must demonstrate that its exclusion of Chabad's menorah display from the Rotunda is narrowly tailored to serve its purported compelling state interest. See City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-10, 104 S.Ct. 2118, 2130-31, 80 L.Ed.2d 772 (1984) (a remedy is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy"). Of course, we have just explained that Georgia's articulated compelling interest rings hollow. Even so, we briefly note what should be obvious, that total exclusion of Chabad's menorah from the Rotunda is not narrowly drawn.
 
 
 46
 Georgia need not limit--much less eliminate--Chabad's speech at all. To the extent that some members of the public may misperceive state endorsement of Chabad's menorah, Georgia could simply meet its burden by explaining the nature of a public forum rather than by excluding all speech with potentially (but mistakenly) suspect content. For example, Georgia could post signs disclaiming state endorsement of private speech in the Rotunda.[18] See Allegheny, 492 U.S. at 619, 109 S.Ct. at 3114-15 (noting that the presence of a sign[19] "further diminishes the possibility that the tree and the menorah will be interpreted as a dual endorsement of Christianity and Judaism... [and that] an 'explanatory plaque' may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs."). But see id. at 619, 109 S.Ct. at 3114 ("no sign can disclaim an overwhelming message of endorsement"); American Jewish Congress v. Chicago, 827 F.2d 120, 128 (7th Cir.1987) ("a disclaimer of the obvious is of no significant effect"). More generally, Georgia could "take [other] steps to remove indicia of endorsement of private religious speech," Doe, 964 F.2d at 621, short of total exclusion of Chabad's menorah display. We need not hypothesize what particular disclaimers Georgia may employ. It is enough for us to conclude that Georgia's total exclusion of Chabad's menorah display was not narrowly drawn to achieve a compelling state interest.
 
 III.
 
 47
 Because Georgia would not contravene the dictates of the Establishment Clause by neutrally and nonpreferentially allowing Chabad to display its menorah in the Rotunda during Chanukah, Georgia's exclusion of Chabad's menorah is neither necessary nor narrowly tailored to achieve a compelling state interest. Accordingly, we reverse.
 
 
 48
 IT IS SO ORDERED.
 
 ANDERSON, Circuit Judge, concurring:
 
 49
 I concur. My analysis is entirely consistent with my understanding of the majority opinion, and I write separately only to emphasize a few points. I agree that the State of Georgia has failed to demonstrate a compelling interest for curtailing Chabad's speech, and alternatively I agree that the State has failed to demonstrate that its action in completely banning the exhibit was narrowly tailored. As stated by the majority, the controlling standard in this case is derived from Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Under that standard, a court must determine whether the challenged governmental action is sufficiently likely to be perceived as an endorsement of religion. The inquiry is fact sensitive. Lynch v. Donnelly, 465 U.S. at 678-79, 104 S.Ct. at 1362 ("In each case, the inquiry calls for line-drawing; no fixed, per se rule can be framed.") The focus is the perception of a reasonable observer. County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 3115, 106 L.Ed.2d 472 (1989). The reasonable observer is well informed, evaluates the endorsement issue in light of the relevant history and context, Allegheny, 492 U.S. at 630, 109 S.Ct. at 3121, and is generally familiar with the contours of the Free Speech Clause and the public forum doctrine. Wallace v. Jaffree, 472 U.S. 38, 76, 83, 105 S.Ct. 2479, 2500, 2503, 2504, 86 L.Ed.2d 29 (1985) ("objective observer, acquainted with the text, legislative history, and implementation of the statute"; "courts should assume that the 'objective observer' ... is acquainted with Free Exercise Clause and the values it promotes"); see also Kreisner v. City of San Diego, 988 F.2d 883, 892 (9th Cir.1993). The State of Georgia has the burden of demonstrating both its compelling interest and that its means are narrowly tailored.
 
 
 50
 In analyzing whether or not the fact sensitive inquiry at issue here--whether the proposed exhibit is sufficiently likely to be perceived by a reasonable observer as an endorsement of religion--several facts point toward endorsement. It is clear that the location in a core government building, a beat away from the very heart of the government, would tend to induce an inference of state complicity. Also, though the reasonable observer is familiar with the facts that led the district court to conclude that the Rotunda is a public forum and also familiar with the meaning of public forum status, it is also true that in this particular public forum, the speakers have not all been private speakers, but the State itself has also spoken.
 
 
 51
 On the other hand, as the majority opinion so forcefully demonstrates, there are powerful factors which indicate that a reasonable observer would not perceive endorsement. The opinion for the court appropriately emphasizes the single most significant factor, namely, the public forum status of the Rotunda. Because of this status, and because the reasonable observer is familiar with both the facts of this public forum status and the meaning thereof, the reasonable observer is deemed to know that private speakers often speak in the Rotunda with no State endorsement. This is true notwithstanding the location in a core government building. The majority opinion also appropriately points out that the burden of proof is on the State of Georgia; it has the burden of demonstrating both its compelling interest and that its means are narrowly tailored. Thus, if appropriate signage could eliminate any reasonable perception of endorsement, then the State of Georgia would have failed to demonstrate that it had a compelling interest in banning the exhibit. For the same reason, the State of Georgia would have failed to demonstrate that its means were narrowly tailored.
 
 
 52
 Taking into consideration all of the facts and circumstances relevant to this issue, I conclude that appropriate signage would insure the reasonable observer's recognition of the speech at issue as private speech in a public forum. In particular, although the State has also spoken in this public forum, appropriate signage would be sufficient to convey clearly to the reasonable observer that this particular speech, like much of the speech in this public forum, is private speech in which the State has no complicity. Thus, I conclude in this case that appropriate signage would dispel any reasonable inference of state endorsement. Considering all of the relevant circumstances, I conclude that the State has failed to demonstrate either that its interest was compelling or that its means were narrowly tailored.
 
 COX, Circuit Judge, specially concurring:
 
 53
 I concur in the result.
 
 BIRCH, Circuit Judge, concurring:
 
 54
 I concur in Chief Judge Tjoflat's opinion for the court, and in Judge Anderson's concurring opinion.
 
 
 
 [1]
 The Chanukah menorah, a nine-pronged candelabrum, is the principal symbol of that Jewish holiday
 
 
 [2]
 The plaza is a largely concrete area that abuts the steps of the Capitol Building
 
 
 [3]
 The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Attorney General perceived no Establishment Clause problem in allowing Chabad to hold the candle-lighting ceremony (at sundown each day of Chanukah) in the plaza if Chabad removed the menorah following the ceremony. See Chabad-Lubavitch of Ga. v. Harris, 752 F.Supp. 1063, 1065 (N.D.Ga.1990). In his opinion letter, the Attorney General concluded that the Establishment Clause precluded the Georgia Building Authority from exhibiting a Christmas display in the Capitol Building's Rotunda. The Building Authority planned to introduce the display, which would consist of a live nativity scene and a Christmas tree, with a religious ceremony and prayers. Id
 
 
 [4]
 This First Amendment right is protected from state infringement by the Fourteenth Amendment. See Everson v. Board of Educ., 330 U.S. 1, 8, 67 S.Ct. 504, 507-08, 91 L.Ed. 711 (1947)
 
 
 [5]
 Chabad sought this relief under 42 U.S.C. Sec. 1983 (1988), which states in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [6]
 Chabad conceded that the Georgia Building Authority's content-neutral, restrictive-use policy, which prohibits private citizens from placing objects on public property, foreclosed the relief it sought in count I and that Georgia was entitled to prevail on that count
 
 
 [7]
 The district court did not publish its order granting the State summary judgment. The order appears as an appendix to the panel opinion affirming the district court's disposition. See Chabad, 976 F.2d at 1387
 
 
 [8]
 See, e.g., Lamb's Chapel v. Center Moriches School Dist., --- U.S. ----, ----, 113 S.Ct. 2141, 2149, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in the judgment) (likening the Lemon test to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried"); Allegheny v. ACLU, 492 U.S. 573, 655-56, 109 S.Ct. 3086, 3134, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part) (questioning wisdom of the Court's continued adherence to the Lemon test); Wallace v. Jaffree, 472 U.S. 38, 112, 105 S.Ct. 2479, 2519, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (The Lemon test "has no basis in the history of the amendment it seeks to interpret, is difficult to apply and yields unprincipled results."); Comment, Raul M. Rodriguez, God is Dead: Killed by Fifty Years of Establishment Clause Jurisprudence, 23 St. Mary's L.J. 1155, 1167-68 (1992) (noting that "the Lemon test has yielded inconsistent results," has been applied erratically by the Court, and has been subjected to considerable criticism); Leading Cases, 106 Harv.L.Rev. 163, 259-60 (1992) (noting that scholars and Supreme Court Justices alike have severely criticized the Lemon test); Mark E. Chopko, Religious Access to Public Programs and Governmental Funding, 60 Geo.Wash.L.Rev. 645, 654 (1992) (arguing for the abandonment of the "aptly named" Lemon test, and noting that it is "neither useful nor practical"); Michael W. McConnell, Accommodation of Religion, 1985 S.Ct.Rev. 1, 58-59 (noting irrelevance of the Lemon test to Supreme Court decision-making). The Court itself has expressed reservations about its adherence to Lemon. See Lynch v. Donnelly, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area."); id. ("In two cases, the Court did not even apply the Lemon 'test.' "); Mueller v. Allen, 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (Suggesting that Lemon test "provides 'no more than [a] helpful signpos[t]' in dealing with Establishment Clause challenges" (quoting Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)))
 
 
 [9]
 The citizenry's conduct is, of course, subject to reasonable content-neutral time, place, and manner regulations. See Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). In this case, there are none. The Georgia Building Authority's content-neutral, restrictive-use policy does not apply in the Rotunda. See Chabad, 976 F.2d 1386 app. at 1389
 
 
 [10]
 In so contending, Georgia is, in effect, asserting the peoples' right to prevent the state from establishing a religion; moreover, Georgia is implying that, at a citizen's behest, a court would order it to have Chabad's display removed from the Rotunda
 
 
 [11]
 Even if Allegheny did control this case--which it does not--the district court misapplied the endorsement of religion test. The district court found that many individuals viewing the menorah display in the Rotunda would not know that the Rotunda is a public forum and, hence, would perceive that Georgia endorses Judaism. The endorsement test, however, is not based on perceptions of the ill-informed, first-time visitor who simply views a religious symbol in a government building without regard to public forum issues. See Kreisner, 988 F.2d at 892 ("This hypothetical observer is informed as well as reasonable; we assume that he or she is familiar with the history of the government practice at issue, as well as with the general contours of the Free Speech Clause and the public forum doctrine.... Our observer realizes that [the public fora at issue] host an eclectic range of uses throughout the year."); see also Americans United, 980 F.2d at 1553 (cautioning against the " 'Ignoramus's Veto' [which] lies in the hands of those determined to see an endorsement of religion, even though a reasonable person, and any minimally informed person, knows that no endorsement is intended, or conveyed, by adherence to the traditional public forum doctrine"); Doe v. Small, 964 F.2d 611, 630 (7th Cir.1992) (Easterbrook, J., concurring) (criticizing the concept of an "obtuse observer's veto" over religious speech)
 Rather, the endorsement inquiry is based on the perceptions of the reasonable observer who is presumed to be aware of the history of the context in which the religious display may be found. "[T]he 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion." Allegheny, 492 U.S. at 630, 109 S.Ct. at 3121 (O'Connor, J., concurring in part and concurring in the judgment). The reasonable observer, then, would view the menorah display fully aware that the Rotunda is a public forum in which a multiplicity of groups, both secular and religious, have sponsored displays. Cf. McConnell, Accommodation of Religion, 1985 S.Ct.Rev. at 48 ("Looking to an 'objective observer' cannot substitute for a constitutional standard. Such a formulation serves merely to avoid stating what considerations inform the judgment that a statute is constitutional or unconstitutional. If Justice O'Connor's 'objective observer' standard were adopted by the courts, we would know nothing more than that judges will decide cases the way they think they should be decided.").
 
 
 [12]
 The Allegheny Court took pains to clarify that the Grand Staircase's "particular physical setting" did not present any public forum issue. The Court explained that:
 The Grand Staircase does not appear to be the kind of location in which all were free to place their displays for weeks at a time, so that the presence of the creche in that location for over six weeks would then not serve to associate the government with the creche.... In this respect, the creche here does not raise the kind of ' "public forum" ' issue, cf. Widmar v. Vincent, ..., presented by the creche in McCreary v. Stone, 739 F.2d 716 (CA2 1984), aff'd by an equally divided Court, sub. nom. Board of Trustees of Scarsdale v. McCreary[, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985) ] ... (private creche in public park).
 Allegheny County, 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50. In McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), the court held that a private group's two-week Christmas display of a creche in a public park, a traditional public forum, would not violate the Establishment Clause.
 
 
 [13]
 Chabad, 976 F.2d 1386 app. at 1391. More precisely, the Rotunda is a "designated public forum." As we have noted before:
 "[L]imited" public forum terminology is misleading because "[a]lthough the government, when it turns property from a nonpublic forum into a public one, may do so only for a limited purpose, ... it also may open the forum to the same extent as a traditional forum." Accordingly, this ... category of property is best described in terms of "designated" or "created" public forums.
 Searcey v. Crim, 815 F.2d 1389, 1391 n. 4 (11th Cir.1987) (quoting M.N.C. of Hinesvile, Inc. v. Department of Defense, 791 F.2d 1466, 1472 n. 2 (11th Cir.1986)).
 
 
 [14]
 In a footnote in its brief to this en banc court, Georgia perfunctorily suggests that the district court's fact-finding could have been more thorough. Expressly recognizing that the panel agreed with the district court that the Rotunda is a public forum, however, Georgia refrains from attacking the district court's finding. For more than a decade, Georgia has granted diverse groups, both secular and religious, access to, and permission to speak in, the Capitol Rotunda. Chabad, 976 F.2d 1386 app. at 1390; see Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 ("[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."). Georgia's spiritless footnote neither compels nor inspires us to revisit the district court's clear finding that the Rotunda is a public forum
 
 
 [15]
 Chabad, 976 F.2d 1386 app. at 1390
 
 
 [16]
 Georgia argues, however, that Jager v. Douglas County Sch. Dist., 862 F.2d 824 (11th Cir.), cert. denied, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), is to the contrary. Georgia's argument is lost on us. In Jager, we held that a school district's "equal access" policy of authorizing religious invocations at public high school football games violated the Establishment Clause. Under the equal access plan, students, parents, and school staff members could seek to deliver a religious invocation at football games, and the student government would randomly select an invocation speaker for each game. Jager involved state-sponsored religious speech in a non-public forum; quite different from the private religious speech in a public forum in the instant case. The Jager court explained:
 When a religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school-owned facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation.... This message becomes even clearer when the context of these pregame prayers is understood. In the past, pregame invocation speakers at the Douglas County High School, with very few exceptions, have been Protestant Christian ministers.
 862 F.2d at 831. Indeed, the school district's so-called "equal access" policy was a subterfuge for "the continuation of Protestant Christian invocations." Id. Jager was not a public forum case.
 
 
 [17]
 Giving full effect to the public forum doctrine does not elevate the Free Speech Clause above the Establishment Clause. The central Establishment Clause inquiry--whether Georgia endorses Judaism by permitting Chabad to display its menorah in the Rotunda--is resolved by reference to the Rotunda's status as a public forum. Because the Rotunda is a public forum, in which the speech of private parties does not enjoy the State's imprimatur, there is no Establishment Clause violation in the first instance to weigh against Chabad's rights under the Free Speech Clause. Courts that have found otherwise, see, e.g., Kaplan v. Burlington, 891 F.2d 1024, 1029 (2d Cir.1989) (If religious groups "had an absolute constitutional right to engage in symbolic expressive conduct in a public forum such as City Hall Park, limited only by narrow time, place and manner regulations ... the public forum doctrine would swallow up the Establishment Clause."); Smith v. County of Albemarle, 895 F.2d 953, 958-60 (4th Cir.1990) (weighing rights in Free Speech Clause against those in Establishment Clause), simply misunderstood the principles they sought to apply
 With notable panache, Chabad's counsel offered the following limerick at oral argument to emphasize the point:
 It seems to a young rabbi of Chabad,
 That the Constitution is exceedingly odd;
 To protect all speech in a public place
 On AIDS, abortion, or race,
 But to prohibit any person's mention of God.
 
 
 [18]
 We have grave doubts whether, under circumstances like those in this case, a state may post signs in front of only some displays, or beside only certain speakers. Such a practice might permit the state to treat speech differently within the public forum based on the content of the speech. Disclaiming endorsement of only certain speech may suggest approval of non-disclaimed speech, all contrary to the nature of a public forum
 We are more comfortable with the prospect of the state erecting signs designed to disclaim state sanction of all speech within the forum; that is, explaining the nature of a public forum. While some of our sister circuits have entertained the question whether particular signs accompanying particular religious displays sufficiently disclaim state endorsement, see, e.g., Americans United, 980 F.2d at 1546; Kaplan, 891 F.2d at 1033; American Jewish Congress v. Chicago, 827 F.2d 120, 128 (7th Cir.1987), we need not and will not add our voice to theirs.
 
 
 [19]
 In Allegheny, the city itself sponsored a holiday display and erected an 18-foot menorah next to a 45-foot Christmas tree. Although a private Jewish group owned the menorah, the city stored, erected, and removed the menorah. The city placed a sign at the foot of the tree that declared:
 Salute to Liberty.
 During this holiday season, the City of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.
 492 U.S. at 582, 109 S.Ct. at 3094-95.