Rabbi Reuven FLAMER, Plaintiff,

v.

CITY OF WHITE PLAINS, NEW YORK, Defendant.

No. 92 Civ. 9165 (SS).

United States District Court, S.D. New York.

Dec. 6, 1993.

Nathan Lewin, Niki Kuckes, James Heavner, Miller, Cassidy, Larocca & Lewin, Washington, DC, for plaintiff Rabbi Reuven Flamer.

Vincent R. Fontana, Robert P. Pagano, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for defendant City of White Plains, NY.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

This case involves the interplay between two of our nation's most cherished values:

freedom of expression and freedom of religion. In 1991 and 1992, plaintiff Rabbi Reuven Flamer ("Rabbi Flamer") sought permission to display a menorah during the holiday of Chanukah in one of two city-owned parks, Tibbits Park ("Tibbits") or Main Street/Mamaroneck Avenue Plaza Park ("Main"), located in the downtown area of White Plains, New York. Defendant, the City of White Plains, New York (the "City"), denied both requests pursuant to a December 2, 1991 Resolution (the "Resolution"), adopted by the White Plains Common Council (the "Common Council"), which prohibits "fixed outdoor display[s] of religious or political symbols" in City parks.

Rabbi Flamer desires to erect a temporary free-standing menorah in a City park during the eight day holiday of Chanukah this year and in the future. He claims that the City's Resolution is unconstitutional under the Free Speech and Free Exercise Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. Rabbi Flamer requests that I (1) declare the Resolution unconstitutional; (2) permanently enjoin the City from applying the Resolution to his requests to display a menorah in a City park; and (3) order the City to permit him to erect a free-standing menorah in a City park during the Chanukah holiday this year and thereafter.

The City concedes that the Resolution restricts expressive conduct protected by the First Amendment, but contends that the Resolution is a constitutionally valid time, place and manner restriction that is necessary to avoid a violation of the Establishment Clause. The City claims that because it has never allowed fixed, free-standing religious displays in City parks, permitting such a display now would violate the Establishment Clause because it would convey the impression that the City endorsed particular religions or religion generally.

This case was tried before me on October 18, 1993, and the record, as agreed by the parties, consists entirely of stipulations of fact, depositions, answers to interrogatories and requests for admissions, and exhibits. Jurisdiction is premised on 28 U.S.C. §§ 1331 & 1343(a) (1993). This Opinion and Order sets forth my findings of fact and conclusions of law. For the reasons discussed below, I find the Resolution unconstitutional and enjoin the City from applying the Resolution to Rabbi Flamer's requests.

## I. BACKGROUND

Rabbi Flamer is an Orthodox Jewish Rabbi who is a member of the Hasidic Lubavitcher sect of Orthodox Judaism. Rabbi Flamer resides in White Plains, New York. At all relevant times, Rabbi Flamer has served as the Executive Director of Chabad Lubavitch of Westchester County ("Chabad"). Chabad is an Orthodox Jewish organization concerned with Jewish education and other issues. Chabad does not have a membership in the sense of a congregation, and Rabbi Flamer and his wife are the organization's sole officers.

The City is a municipal corporation of the State of New York, located in Westchester County. The City, through the White Plains Department of Recreation and Parks (the "Parks Department"), maintains over 200 acres of park land in Westchester County. Since 1979, Joseph P. Davidson has served as the Commissioner of the Parks Department.

Chapter 6–2 of the White Plains Code, entitled "Parks and Playgrounds," sets forth general rules governing use of City parks. Park use is also governed by municipal, state and federal laws, as well as formal and informal policies and practices devised by the Parks Commissioner. Like private parties, the City must comply with all relevant laws and administrative rules in its use of the parks.

Those, including the City, who wish to use a City park for an event involving more than 25 people, the placement of objects or equipment, or the use of a sound system must obtain a permit from the Parks Department. To request a permit, parties generally send a written request to the Parks Commissioner detailing various aspects of the proposed use, including the time, date, and number of people expected. All requests other than those for ballpark or athletic permits are handled by the Parks Commissioner and his Deputy Commissioner, who examine them for user

conflicts, operational concerns and legality. If a request is granted, permit holders typically must meet certain conditions, such as providing evidence of insurance, ensuring that public access to the park is not impeded, and agreeing to comply with the City's noise ordinances.

## A. *Tibbits and Main*

Two of the City's parks, Main and Tibbits, are situated in the downtown area of White Plains. Main, a public park which has been in existence since 1983, is slightly less than half an acre in size, and is bounded by Main Street, Mamaroneck Avenue and Court Street. Main is located approximately one block from City Hall; however, City Hall is only visible from that portion of the park which fronts on Main Street. Various commercial buildings and stores surround Main, but no government buildings adjoin the park. Main contains, among other things, a fountain, park benches and concrete planters.

A few blocks from Main lies Tibbits, a public park, whose use dates back to George Washington's time, when the area served as the town commons or village green. Two acres in size, Tibbits consists of a strip of land extending several blocks, approximately 15 to 20 feet wide at its narrowest end, the northernmost end of the park, and 300 to 400 feet at its widest point, the southernmost end of the park. The park forms a median between North and South Broadway, with three lanes of traffic on each side. Residential and commercial buildings as well as two government buildings, the White Plains Parking Authority and the City Armory which houses certain municipal offices, adjoin the park. Like Main, Tibbits is located approximately one block from City Hall, which is visible only from that area of the park located at the corner of Main Street and North Broadway. Tibbits contains, among other things, park benches, a fountain and a gazebo, constructed in 1984 by the White Plains Beautification Foundation, Inc. City Hall can not be seen from the park block where the fountain and gazebo are located.

Tibbits and Main are "dedicated" park lands open for use by members of the public. For property to become "dedicated" park land, the Common Council must pass a resolution designating the property as such and the New York State legislature must approve the designation. Unlike other municipal property, "dedicated park land" may only be used for park and recreational purposes and can only be alienated by act of the state legislature. In addition, the Parks Department has classified Tibbits and Main as "passive" parks. Passive parks are parks set aside for peaceful enjoyment by individuals. In a passive park, individuals may walk, sit, talk, relax and do anything else that is quiet and passive. Active parks, by contrast, are those where active athletic and recreational activities are permitted.

Over the years, a wide array of expressive activity by private groups and individuals has occurred in both Tibbits and Main. A prime arena for political expression, Main has been used by numerous political and social activist organizations for demonstrations, rallies and vigils, around issues as diverse as Middle East peace, the United States' invasion of Panama, abortion rights and nuclear disarmament.[1] Main was also used as the starting or ending point in a march by advocates for the homeless. In addition, a nursing organization held a vigil for cancer victims, which included an ecumenical service, on Main's Plaza. In Tibbits, historically a forum for public assembly and debate, the City and the White Plains Cemetery conducted a wreath-laying ceremony for soldiers killed in World War I. The Sons of Italy have also conducted a wreath-laying ceremony there to commemorate Columbus Day. Tibbits has also been the site of gatherings honoring those who died in the Civil and Spanish American Wars.

---

1. For example, WESPAC, a private organization involved in political and social activism, has held vigils in Main around the United States' invasion of Panama and the Middle East peace process. The permits issued to WESPAC in connection with these vigils allowed the organization to distribute information and place tables and chairs in certain areas of the park. The Nuclear Freeze Movement has also used the park to commemorate the anniversary of Hiroshima. In addition, during the 1992 presidential campaign, pro-choice groups held a campaign rally there for President Clinton, Vice–President Gore and local pro-choice candidates.

In addition, diverse creative and social events are regularly held in these parks. Since 1972, the Parks Department and the Citizens's Festival Committee, a private, not-for-profit organization, have sponsored the White Plains Outdoor Arts Festival in Tibbits, along the sidewalks of Main Street and Broadway, and in Main's Plaza. The Arts Festival, which showcases more than 160 exhibits, lasts approximately three days over a weekend in June, and involves the erection of various temporary but fixed structures, namely, free-standing tents, temporary barricades and signs. These objects are permitted to remain in the parks overnight during the three-day event.

Tibbits and Main are also home to the Noonday Festival of Live Music, another annual creative event organized by the City. This festival, which began in Tibbits in 1980 and was extended to Main in 1983, involves a series of musical concerts during the months of June and July and is funded by corporate sponsors. In Main, portable shade tents have been erected for the performances.[2]

Winter holiday festivities in Tibbits and Main have regularly included fixed displays which remained standing throughout the holiday season. On several occasions since 1983, a holiday tree, donated by private parties and decorated by volunteers and City employees, has been displayed in Main. This tree, which is approximately four to six feet in height, has remained in place throughout the December holiday season. Similarly, a decorated holiday tree, ranging from fifteen to thirty feet in height, has been placed in or near the fountain in Tibbits each year since 1983. Like the Main holiday trees, the Tibbits' trees are donated by private parties, and have remained standing throughout the holiday season, and occasionally through spring. In addition, the White Plains Beautification Foundation, Inc., a private group, has placed a decorated holiday tree, up to eight feet in height, in the Tibbits gazebo each year from 1990 to 1992. On occasion, Christmas songs, some religious in nature, have been sung or played at the lighting of the Main and Tibbits' holiday trees. In accordance with Supreme Court precedent, *see County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 616, 109 S.Ct. 3086, 3113, 106 L.Ed.2d 472 (1989) (plurality opinion) (a "Christmas tree, unlike a menorah, is not itself a religious symbol"), the parties acknowledge, however, that the holiday trees in Tibbits and Main are not religious symbols.

The Parks Department has also permitted private fixed displays on other City-owned property. For the past four years, a United Way sign has been placed for some months at the corner of Gedney Way and Mamaroneck Avenue on the City's right-of-way near Gilley Park. A similar sign has been displayed on the steps of City Hall.

While Tibbits and Main have served as forums for a host of diverse gatherings, displays and other activities, the Parks Department has on occasion denied requests to use the parks. For example, based on its designation of Main and Tibbits as "passive parks," the Parks Department refused the Westchester Chapel and Grace Church permission to hold musical concerts in Main, and a labor union permission to hold a rally involving approximately 1500 people in Tibbits.

## B. *Rabbi Flamer's 1991 Menorah Display Request*

In October 1991, Rabbi Flamer wrote to Commissioner Davidson to request a permit, on behalf of Chabad, to erect an electric menorah in Main during the Jewish holiday of Chanukah, which lasted from December 1 to December 8, 1991.[3] Chanukah is a religious holiday observed by Jews during an eight day period which ordinarily falls between the latter part of November and the first part of January of each year. The menorah, a religious symbol of the Jewish faith associated with the celebration of lights of the Chanukah holiday, is a nine-pronged candelabra representing the eight days of

---

**2.** Other activities in Main have included noonday one-mile walks in 1991 and 1992, co-sponsored by the City and Physicians' Health Services.

**3.** In his letter, Rabbi Flamer, however, requested to leave his menorah display standing until December 10, 1991, two days after the Chanukah holiday ended.

Chanukah, with one space for a candle used to light the other eight. Designed for outdoor use, the menorah Rabbi Flamer proposed to display was constructed of aluminum and measured nine feet tall. In conjunction with his display request, Rabbi Flamer also requested permission to run a sound system in connection with a menorah lighting ceremony.

Finding Rabbi Flamer's request "unusual," Commissioner Davidson brought it to the attention of White Plains mayor, Alfred Del Vecchio. When Rabbi Flamer contacted him a few weeks later to inquire about the request, Commissioner Davidson informed Rabbi Flamer that it had been referred to the Corporation Counsel's office.

As of November 6, 1991, Rabbi Flamer had not received any response to his request. That day he sent a second letter to Commissioner Davidson, stating that he assumed the City's silence meant that a permit was forthcoming and thus, was going "full steam ahead" with the event. A week later, by letter dated November 13, 1991, Commissioner Davidson informed Rabbi Flamer that the City had denied his request to erect a menorah in Main, but invited Rabbi Flamer to meet with him to discuss "other locations that would be more suitable," and "matters such as plan specifications for the Menorah, hold harmless clauses for the City, adequate insurance, and security measures". Although the letter stated that the distribution of food and the amplification of music in connection with Rabbi Flamer's proposed event would be inappropriate, it offered no explanation as to why the City had denied Rabbi Flamer's request. Later, during his deposition, Commissioner Davidson explained that recent vandalism in Main had prompted the City to deny Rabbi Flamer's request.

On or about November 26, 1991, Rabbi Flamer and Commissioner Davidson, joined by Joseph Nicoletti, the Deputy Commissioner of the White Plains Department of Public Works, met at Tibbits. Deputy Commissioner Nicoletti inspected Rabbi Flamer's menorah, and informed him that one of the menorah's electrical prongs was defective. Rabbi Flamer agreed to change the prong and provide proof of insurance. While at Tibbits,

Commissioner Davidson, Rabbi Flamer and Deputy Commissioner Nicoletti discussed potential locations in Tibbits for placement of the menorah. At trial, the City argued that both the gazebo and fountain areas of Tibbits were too small to hold a combined holiday tree and menorah display. The City maintains that the only other site capable of displaying the menorah with adequate lighting is an adjacent grass area, separated from the gazebo and fountain by a pathway. The City does not allege that the grass area can not accommodate both a menorah and a holiday tree.

After the meeting at Tibbits, Rabbi Flamer believed that, assuming his insurance was in order and the menorah plug was replaced, the City would issue a permit for the proposed menorah in Tibbits the following Friday, on November 29, 1991. Hence, prior to that date, Rabbi Flamer replaced the electrical plug and confirmed that Deputy Commissioner Nicoletti had received a copy of his insurance policy.

The day after Rabbi Flamer met Commissioner Davidson in the park, a newspaper article appeared in the Gannett Newspapers, *Reporter Dispatch*, entitled "City Will Let Menorah Stand in the Park." The article reported that the City planned to allow a Hasidic group to erect a menorah in Tibbits, next to a holiday tree. This article sparked great controversy within the Jewish community, and prompted vocal opposition by a number of rabbis in the Westchester community who believed that the Chanukah holiday should be celebrated in private settings, such as homes and synagogues, and not in public spaces like parks.

On November 29, 1991, Mayor Del Vecchio called a special meeting of the Common Council to discuss Rabbi Flamer's request. The special meeting was held two days later on December 1, but because of the lack of a quorum, was adjourned to the following day.

Shortly around sundown on December 1, 1991, the first day of Chanukah, Rabbi Flamer and approximately thirty other individuals gathered in Tibbits to celebrate the beginning of Chanukah. Rabbi Flamer brought a two and one-half foot menorah, which was

not lit. The gathering lasted approximately twenty minutes, during which time the assembled group performed several traditional dances. The City did not prevent Rabbi Flamer from using Tibbits for this gathering and indicated at trial that religious ceremonies of this type were not prohibited in City parks.

On December 2, 1991, all seven members of the Common Council met in a public meeting attended by Rabbi Flamer, Corporation Counsel Anthony J. Grant, and numerous community residents. During the Common Council meeting, Rabbi Flamer's proposed menorah display came under strong attack from members of the White Plains Jewish community.[4] Rabbi Mark Weiner of the White Plains Jewish Community Center asserted that the "overwhelming majority of the Jewish community" felt that the proposed menorah display should not be allowed. In addition, a letter submitted by the American Jewish Committee opposing the display was read into the record.

Corporation Counsel Grant advised the Common Council members that they had two options: (1) deny Rabbi Flamer's request based on the City's historical practice of "not permitt[ing] religious [ ]or political displays in any of [its] ... parks;" or (2) permit the City's parks to be used as "public forum[s]" by religious as well as nonreligious groups and persons.

After extensive debate, the Common Council passed the Resolution which reads as follows:

> **WHEREAS,** the City has received requests for the outdoor display of religious symbols in city parks; and
>
> **WHEREAS,** historically the City of White Plains has not permitted the outdoor display of religious or political symbols in city parks; now, therefore, be it
>
> **RESOLVED,** that the City affirms its historical position that there be no fixed outdoor display of religious or political symbols in the City's parks.

Based on the Resolution, Rabbi Flamer's request to erect a menorah display was denied.

### C. *Rabbi Flamer's 1992 Menorah Display Request*

The following year, on December 7, 1992, Rabbi Flamer made another request to erect a menorah display in a City park during the Chanukah holiday, which began that year on December 18. By letter dated December 9, 1992, Corporation Counsel Grant advised Rabbi Flamer that his permit request was denied on the basis of the Resolution's prohibition of outdoor fixed displays of religious or political symbols. On or about December 14, 1992, Rabbi Flamer sent a letter to Corporation Counsel Grant requesting that the City reconsider its decision. Citing the Supreme Court's decision in *Allegheny,* Rabbi Flamer expressed his willingness to erect his menorah "immediately adjacent to the Christmas tree in Tibbits Park, near the corner of Main Street and Broadway." The City refused to reconsider its denial, and the present lawsuit ensued.

At trial, Rabbi Flamer indicated that he had filed a request to erect a menorah in a City park this year.[5] Though claiming that he was unaware of this request, counsel for the City made clear that any such request would be denied pursuant to the Resolution.

### DISCUSSION

### I. *Standing*

▮] Initially, the City argues that Rabbi Flamer lacks standing to launch a facial attack on the Resolution because he has never requested or been denied permission to erect a menorah in his individual capacity. The City claims that Rabbi Flamer's 1991 and 1992 permit requests were made on behalf of his organization, Chabad, and thus, Rabbi Flamer has not demonstrated the requisite "injury in fact" to confer standing.[6]

---

**4.** It appears that prior to the December 2, 1991 meeting, Rabbi Mark Weiner and members of the American Jewish Committee contacted the Common Council to voice their opposition to Rabbi Flamer's proposed menorah display.

**5.** This request, however, is not included in the record before me.

**6.** Rabbi Flamer was substituted for Chabad as the plaintiff in this action precisely because of the City's initial objection that Chabad had no independent corporate existence, and was merely

Rabbi Flamer asserts that the requests were made on his own behalf as well as that of Chabad–Lubavitch, and further contends that even if they were not, he would still have standing to challenge the Resolution because he wishes to erect a menorah in a City park this year and in the future.

■ I agree that Rabbi Flamer has standing to bring a facial challenge to the Resolution. While standing will lie only if a plaintiff possesses a sufficient personal stake in the controversy, that stake is established where such plaintiff has suffered " 'some threatened or actual injury resulting from the putatively illegal action' ". *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citation omitted). The standing requirement is, therefore, met where a regulation or law poses a real and imminent threat of injury to a plaintiff. *Valley Forge Christian College v. Americans United for the Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *see Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir.1980) (citizens had standing to challenge census undercount because they alleged concrete harm in form of dilution of votes and risk of decreased federal funds).

The Resolution clearly poses a threat of injury to Rabbi Flamer. By barring fixed displays of religious symbols in City parks, the Resolution expressly prohibits the expressive activity Rabbi Flamer seeks to engage in: erecting a temporary free-standing menorah in a City park that will remain standing throughout the eight-day Chanukah holiday. Rabbi Flamer has made his desire to erect a menorah display this year concrete by requesting a permit to do so. At trial, counsel for the City stated that any such request would be denied under the Resolution. Thus, whether Rabbi Flamer requested permission to erect a menorah on his own behalf in 1991 and 1992 is irrelevant, since

the Resolution poses present and immediate harm to Rabbi Flamer's free speech rights.[7] Accordingly, Rabbi Flamer has standing to bring a facial challenge to the Resolution.

## II. *The Resolution*

■ ] The First Amendment, applicable to the City via the Fourteenth Amendment, *Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law abridging the freedom of speech." U.S. Const. amend. I. Religious and political speech enjoy the full protection of this fundamental guarantee. *Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (political speech "operates at the core of the First Amendment"); *Widmar v. Vincent*, 454 U.S. 263, 268–69, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) (religious worship and discussion are "forms of speech and association protected by the First Amendment"); *see Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981) (oral and written dissemination of religious views protected by First Amendment).

■ While displays of religious and political symbols are unquestionably forms of protected speech under the First Amendment, *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1969) (wearing black armband to protest Vietnam War is protected speech); *Chabad–Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1386 (11th Cir.1993) (en banc) (menorah display in core government building deemed protected speech); *Kreisner v. City of San Diego*, 988 F.2d 883, 891–92 (9th Cir.1993) (private display in public park consisting of scenes from New Testament

---

the alter ego of its two officers—Rabbi Flamer and his wife.

**7.** Even if Rabbi Flamer had not applied for a permit this year, he still would have standing to challenge the Resolution. The Supreme Court has recognized an exception to ordinary standing requirements for broadly written laws, such as the Resolution, whose every application creates "an impermissible risk of suppression of ideas."

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799 n. 15, 104 S.Ct. 2118, 2125 n. 15, 80 L.Ed.2d 772 (1984). Since the "very existence" of such laws "may have a deterrent effect on free expression," they are subject to a facial challenge "even by a party whose own conduct may be unprotected". 466 U.S. at 799, 104 S.Ct. at 2125.

was protected speech under First Amendment); *Americans United for Separation of Church & State v. City of Grand Rapids,* 980 F.2d 1538, 1542 (6th Cir.1992) (en banc) (menorah display in public plaza was protected speech); *Doe v. Small,* 964 F.2d 611, 618–19 (7th Cir.1992) (en banc) (display of religious paintings in public park was protected speech); *McCreary v. Stone,* 739 F.2d 716, 723 (2d Cir.1984) (creche display in public park held "protected speech" for First Amendment purposes), *aff'd by an equally divided Court,* 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), it is well-settled that this fundamental guarantee does not translate into unlimited access to government property for expressive purposes. *International Soc'y for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (Port Authority regulation forbidding solicitation of money in airport terminals did not violate the First Amendment). Whether restrictions on access to public property impermissibly infringe on free speech rights depends on the nature of the property at issue. Under this "forum-based" approach, public property is classified into three categories. *Krishna,* —— U.S. at ——, 112 S.Ct. at 2705–06; *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

■ The first category, the traditional public forum, consists of those places that " 'have immemorially been held in trust for the use of the public, and time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions' ". *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939)). Public parks are "quintessential public forums," since these settings historically have served both in practice and in public perception as recognized enclaves of free expression. *Id.* The most exacting scrutiny attends restrictions on expressive activities in these classic public forums. Government may enforce a content-based restriction on speech in this type of forum only if the regulation is "necessary to serve a compelling state interest," and is "narrowly drawn to achieve that end". *Id.* While content-neutral regulations on expression in traditional public forums need only serve a significant government interest, they, too, must be narrowly-tailored and must "leave open ample alternative channels of communications." *Id.*

■ Less stringent standards govern restrictions on access to properties falling within the second category, the nonpublic forum. Nonpublic forums are government-owned properties not open by tradition to the public for expressive activities. As to these properties, both content-neutral time, place and manner restrictions and "reasonable" content-based regulations on speech are appropriate. *See Krishna,* —— U.S. at ——, 112 S.Ct. at 2705 ("challenged regulation need only be reasonable"); *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir. 1991) (same). However, government, even in this forum, may not restrict speech because it opposes the viewpoint expressed. *Krishna,* —— U.S. at ——, 112 S.Ct. at 2705–06.

■ The last category, the designated public forum, consists of properties which the government has intentionally opened for expressive activity by all or part of the public. *Krishna,* —— U.S. at ——, 112 S.Ct. at 2705. Access restrictions to these forums are governed by the same rigorous standards that apply to those governing traditional public forums. *Id.* The Second Circuit has identified a sub-category of the designated public forum, which it has termed the "limited public forum". A limited public forum is "created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis,* 927 F.2d at 692 (citing *Deeper Life Christian Fellowship v. Board of Educ.,* 852 F.2d 676, 679 (2d Cir. 1988); *Calash v. City of Bridgeport,* 788 F.2d 80, 82 (2d Cir.1986)). In limited public forums, once government "allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Id.*

As public parks, the City's park land is presumptively traditional public forum property. *United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (public parks, "are considered, without more, public forums"). In arguing that its asserted historical practice of excluding fixed displays of religious and political symbols from its parks defeats this presumption, the City misperceives the relevance of past restrictions on expressive activity in defining a forum. Such restrictions define a forum only if the property at issue is inherently nonpublic and would not have been open to the public for expressive purposes absent affirmative governmental action. *See Travis*, 927 F.2d at 692 (limited public forum created when government opens nonpublic forum but limits expressive activity to certain kinds of activity). Past use restrictions are irrelevant in the case of a public park, which by tradition, not governmental initiative, is open to all manner of speech. *See Kreisner*, 988 F.2d at 893 (no affirmative governmental action required to open public park to specific type of expressive activity).

The Second Circuit's decision in *Kaplan v. City of Burlington*, 891 F.2d 1024 (2d Cir. 1989), does not, as the City contends, stand for the proposition that past governmental practice of excluding particular types of speech alters a public park's status as a traditional public forum, for the *Kaplan* court explicitly recognized that the park at issue, City Hall Park, was "indisputably a traditional public forum". *Id.* at 1029. Admittedly, however, the *Kaplan* decision is somewhat confusing because it does contain language suggesting that limited public forum considerations are relevant in evaluating access restrictions to traditional public forums. In attempting to distinguish *Widmar*, where the Supreme Court held that a University, having created a forum generally open to wide array of student groups, could not enforce a content-based exclusion of religious speech, the *Kaplan* court stated that the City of Burlington "had not created a

forum in City Hall Park open to the unattended, solitary display of religious symbols". *Id.* This language conflates limited public forums with traditional public forums, which as noted above, derive their status from history and tradition, not governmental action. *See Kaplan*, 891 F.2d at 1032 (Meskill, J., dissenting) ("park's status as a public forum does not depend upon whether the City has in the past permitted a particular type of speech or form of expressive conduct").

Moreover, *Kaplan*'s distinction of *Widmar* is flawed by its suggestion that a content-based restriction on access defines the scope of a public forum. The Supreme Court's decision in *Widmar* is exceedingly clear that in a public forum, limited or unlimited in use, the First Amendment proscribes discrimination between non-religious and religious speech as well as discrimination among religious speakers. *Widmar*, 454 U.S. at 278, 102 S.Ct. at 278 (University's exclusion of student groups espousing religious messages from using its premises "violate[d] the fundamental principle that a state regulation of speech should be content-neutral").

Here, the record is devoid of evidence suggesting that the City's parks, unlike most parks, are not traditional public forums. Quite the contrary, the record amply demonstrates that the two City-owned parks in which Rabbi Flamer sought to display his menorah, Tibbits and Main, are classic traditional public forums. Both of these parks have been dedicated by the City for public use as city parks, and under New York law, will be used for such purposes unless and until the City government and the state legislature alter their status.[8] Consistent with this designation, both of these parks throughout the years have served as the situs for a wide array of privately-sponsored public expressive activity, including rallies and demonstrations. Indeed, Tibbits's use as a forum for public expression and assembly dates back to colonial times when the area served as the town commons and village green.

8. Despite their longstanding status as enclaves of public expression, the City claims that Main and Tibbits are not traditional public forums because they are "passive parks". However, the City's ostensible attempt to equate "passive" with "non-expressive" must fail, given that the City has authorized a wide range of public expressive activities in its parks, including abortion rights rallies, political vigils and demonstrations, sponsored by private groups.

Moreover, nothing in the record suggests that any of the City's parks, unlike the park at issue in *Kaplan,* are closely associated with the seat of City government. Certainly, the City's permit requirement for specified activities in City parks does not establish this nexus. Furthermore, although Tibbits and Main are within its vicinity, City Hall is only visible from one corner of each park, and wide avenues separate both these corners from City Hall. In addition, the downtown area in which these parks are located, despite the presence of City Hall and a few other governmental buildings, is not devoted either exclusively or predominantly to government activities. Numerous commercial and residential properties are interspersed throughout the downtown White Plains. As the City has proffered no evidence tying any of its other parks, either in proximity or public perception, to the seat of City government, I conclude that the City's parks are true traditional public forums.

■ Because the Resolution prohibits expressive conduct in traditional public forums, I must now determine whether it is a content-neutral time, place and manner restriction, or a content-based regulation of speech. This is an easy task because the Resolution, barring the "fixed outdoor display of religious or political symbols in the City's parks," is, on its very face, content-based. Defying both language and logic, the City fashions the Resolution a content-neutral time, place and manner restriction because it burdens all religious displays equally. However, it is axiomatic that a regulation is not content-neutral if based on the content of speech. *See Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) ("constitutionally permissible time place and manner restriction[s] may not be based upon either the content or subject matter of speech"). Contrary to the City's assertion, the Resolution is no less content-based be-

cause it bans only one form of religious expression, i.e., the fixed display of religious symbols, but not others, such as ecumenical services or menorah lighting ceremonies in which no fixed displays are used; the content inquiry looks to the prohibition's targets, not its scope.

The Seventh Circuit's decision in *Lubavitch Chabad House, Inc. v. City of Chicago,* 917 F.2d 341 (7th Cir.1990), upon which the City relies in advancing its argument, involved a limited public forum, and in any event, did not, as the City contends, articulate a contrary rule which I should follow. In fact, *Lubavitch* underscores the nondiscrimination principle embodied in the notion of content-neutrality. The regulations at issue in *Lubavitch* were deemed content-neutral because they prohibited *all* groups, not simply all religious groups, from erecting freestanding structures in public areas. *Id.* at 347. Indeed, the *Lubavitch* court expressly recognized that, under the First Amendment, the City could not prohibit religious freestanding structures if non-religious structures were permitted, stating that

First Amendment jurisprudence certainly does mandate that if the government opens a public forum to allow some groups to erect communicative structures, it cannot deny equal access to others because of religious considerations, but the record is clear that *the City has prohibited all groups from erecting structures in the airport public areas.*

*Id.* (emphasis added).[9]

Thus, by mandating content-based exclusions of expressive conduct from traditional public forums, the Resolution is constitutionally permissible only if it is necessary to achieve a compelling state interest, and narrowly-tailored to achieve that end. *Krishna,* —— U.S. at ——, 112 S.Ct. at 2705; *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. Moreover,

---

9. Admittedly, language in *Lubavitch* 's first paragraph might suggest that the court in that case sanctioned regulations that distinguished between secular and religious expressive conduct. 917 F.2d at 342 ("City of Chicago decorates O'Hare facilities with Christmas trees ... but ... intentionally excludes religious symbols from unleased public areas"). However, the Seventh

Circuit in a later opinion, clarified that *Lubavitch* simply "distinguished leased spaces from public areas," and was "careful to point out that Lubavitch's free-standing Menorahs could not be excluded if other free-standing structures were permitted". *Doe v. Small,* 964 F.2d 611, 620 (7th Cir.1992) (en banc).

even if as the City contends its parks were limited public forums, the Resolution would still be subject to strict scrutiny. The City admits, and the record amply demonstrates, that it has allowed secular fixed displays, notably the holiday trees in Tibbits and Main, to remain in its parks for weeks, if not months, at a time. A United Way sign has remained standing on public property near a City park for several months. Assuming its parks were limited public forums, the City, having permitted private fixed displays, could not selectively exclude those of a religious or political nature without a compelling justification. *Widmar*, 454 U.S. at 267–70, 102 S.Ct. at 273–74 (having opened premises for use by student groups, University had to provide a compelling justification for its exclusion of student groups that desired to engage in religious worship and discussion); *see also Travis*, 927 F.2d at 692 ("government is free to impose blanket exclusion on certain types of speech, but once it allows expressive activities of certain genre, it may not selectively deny access for other activities of that genre").

█ The City asserts, however, that the Resolution is necessary to serve the compelling state interest of avoiding violations of the Establishment Clause of the First Amendment.[10] *See Widmar*, 454 U.S. at 271, 102 S.Ct. at 275 ("the interest of the University in complying with its constitutional obligations [under the Establishment Clause] may be characterized as compelling"). Free-standing religious displays in public parks, the City fears, will leave viewers with the impression that it endorses the religious message conveyed in the displays, or religion generally. Isolated religious displays on some public properties may indeed send a message of government endorsement of religion, and I am, therefore, sympathetic to the

City's concerns. *See County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 599, 109 S.Ct. 3086, 3104, 106 L.Ed.2d 472 (1989) (plurality opinion) (creche display on "main" and "most beautiful" part of county courthouse steps sent an "unmistakable message" that county supported creche's religious message); *cf. Allegheny*, 492 U.S. at 650, 109 S.Ct. at 3131 (Stevens, J., concurring in part, dissenting in part) ("the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property").

However, it is critical to remember, as the Supreme Court's public forum analysis instructs, that all public properties are not alike, particularly as they relate to public expressive activity. Except in rare instances, traditional public forums, unlike nonpublic forums, are intimately linked in the public psyche with public expression. Consequently, expressive activity in these quintessential public forums is viewed, and should be viewed, by reasonable observers as that of private speakers, not the government. Thus, I conclude, under the three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971),[11] that while Establishment Clause concerns may warrant bans on religious displays on some public properties, such considerations do not provide a compelling justification for the City's Resolution because it applies to public parks not closely associated with the seat of government, and traditionally open to diverse public expressive activity, including private free-standing non-religious displays.

█ Under *Lemon*, governmental action contravenes the Establishment Clause if (1) it lacks a secular purpose; (2) has the principal or primary effect of advancing or inhibit-

---

10. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion ..." U.S. Const. amend. I. This proscription is applicable to the States via the Fourteenth Amendment. *See Everson v. Board of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711 (1947).

11. Although the *Lemon* test has come under fire by some members of the Court in recent years, e.g., *Lamb's Chapel v. Center Moriches Union Free*

*Sch. Dist.*, — U.S. —, —, 113 S.Ct. 2141, 2150, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in the judgment) (*Lemon* comparable to "a ghoul in a late-night horror movie" that refuses to die), it still controls the Establishment Clause inquiry. *Id.* at — n. 7, 113 S.Ct. at 2148 n. 7 (*Lemon* has not been overruled); *Lee v. Weisman*, — U.S. —, —, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (refusing to reconsider *Lemon*).

ing religion; or (3) fosters an excessive entanglement with religion. *Id.*

Contrary to the City's suggestion, an equal access policy permitting fixed religious displays in its public parks would not be unconstitutional under the first and third prongs of the *Lemon* test. A neutral open-forum policy, providing equal access for religious as well as non-religious speech, has the secular purpose of promoting free speech and religious tolerance. *See Widmar*, 454 U.S. at 271, 102 S.Ct. at 275 ("an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose"); *see also Chabad–Lubavitch of Ga.*, 5 F.3d at 1389 (allowing menorah display would "advance the secular purpose of providing an arena for ... [the] citizenry's exercise of the constitutional right to free speech"); *McCreary*, 739 F.2d at 725 (permitting creche display had secular purpose of providing equal access to public forum for religious speech). That the private speaker seeks to proselytize is irrelevant, for the secular purpose inquiry examines the government's purpose in allowing the speech, not the speaker's goal. *See Lynch v. Donnelly*, 465 U.S. 668, 681, 104 S.Ct. 1355, 1363, 79 L.Ed.2d 604 (1984) (examining whether City had secular purpose in sponsoring creche display in private park); *cf. Board of Educ. of Westside Community Sch. v. Mergens*, 496 U.S. 226, 249, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990) (legislative purpose of statute, "not possibly religious motives of the legislators who enacted the law," is relevant inquiry under secular purpose prong).

Nor would an equal access policy entangle the City with religion, since private religious and secular fixed displays would be on equal footing. The City's evaluation process for requests to erect fixed religious displays would be exactly the same as that used for those involving secular fixed displays. *See McCreary*, 739 F.2d at 725 (application to display creche would involve the same evaluative process required for any other type of display). By contrast, the Resolution's exclusion of fixed religious displays inextricably entangles the City with religion as it requires the City to determine whether a proposed display contains a "religious" symbol. *See Widmar*, 454 U.S. at 271–72 n. 11, 102 S.Ct. at 275 n. 11 (state university would risk greater "entanglement" in attempting to enforce its policy of excluding religious speech).[12] Thus, I do not find that permitting Rabbi Flamer's display in City parks would violate the first or third prong of the *Lemon* test.

The City's more compelling Establishment Clause argument is rooted in *Lemon*'s second prong.[13] The City contends that allowing private free-standing fixed displays of religious symbols in its parks on the same terms as it permits those of a nonreligious nature would create the impression that it endorsed religion. The City bases this argument, in large part, on the divergent outcomes reached by the Supreme Court in *Allegheny* regarding the constitutionality of two holiday displays on public property.

However, *Allegheny*, a highly fact-based decision marked by shifting majorities and conflicting approaches, does not support the City's conclusion. In *Allegheny*, a sharply divided Court held that a creche display on the Allegheny County courthouse steps contravened the Establishment Clause, but a holiday display consisting of 18–foot menorah, a 45–foot Christmas tree and a sign which read "Salute to Liberty" outside a government office building did not. Justices Brennan, Marshall and Stevens believed that both displays violated the Establishment Clause, and reasoned that there should be a

---

**12.** Highlighting the divisiveness sparked by Rabbi Flamer's proposed menorah display among members of the Jewish community in White Plains, the City seems to argue that permitting free-standing religious displays would embroil it in religious conflicts. Potential political divisiveness along religious lines, however, does not render otherwise permissible governmental conduct unconstitutional. *Lynch*, 465 U.S. at 684, 104 S.Ct. at 1365. Indeed, the Supreme Court in *Lynch* expressly held that "no inquiry into poten-

tial political divisiveness is even called for" in cases not involving direct subsidies to religious institutions. *Id.*

**13.** Writing for the plurality in *Allegheny*, Justice Blackmun fleshed out *Lemon*'s second prong, stating that governmental action which impermissibly advances religion is that which has the purpose or effect of endorsing religion. 492 U.S. at 592, 109 S.Ct. at 3100.

strong presumption against publicly supported display of an overtly religious nature. 492 U.S. at 650, 109 S.Ct. at 3131 (Stevens, J., concurring in part, dissenting in part). Justices Blackmun and O'Connor, focusing on the "particular physical settings" of the two displays, deemed the free standing creche display on the county courthouse steps improper, but found no Establishment Clause violation attended the menorah display. 492 U.S. at 598–600, 616–21, 109 S.Ct. at 3103–04, 3113–15 (plurality opinion); 492 U.S. at 626–27, 635, 109 S.Ct. at 3118–19, 3123–24 (O'Connor, J., concurring in part, and concurring in the judgment). Four members of the Court, Chief Justice Rehnquist, and Justices White, Scalia and Kennedy, concluded that both displays should have been permitted, since neither represented an "effort to proselytize" by the local government of Allegheny. 492 U.S. at 664, 109 S.Ct. at 3139 (Kennedy, J., concurring in the judgment in part, dissenting in part).

Given this morass of competing and conflicting rationales, *Allegheny* does not, as the City contends, lead to the inexorable conclusion that fixed religious displays on all public property, unadorned by secular symbols, violate the Establishment Clause. In fact, the plurality opinion expressly stated that the unattended creche display on county courthouse steps did not raise a public forum issue. 492 U.S. at 600 n. 50, 109 S.Ct. at 3104 n. 50 ("the creche here does not raise the kind of 'public forum' issue, *cf. Widmar v. Vincent,* ... presented by the creche in *McCreary v. Stone*"); *see also Chabad–Lubavitch of Ga.,* 5 F.3d at 1390 (*Allegheny* is not a public forum case and its analysis is not applicable to Establishment Clause questions in public forum cases); *cf. Allegheny,* 492 U.S. at 626, 109 S.Ct. at 3119 (O'Connor, J., concurring in the judgment, concurring in part) ("display of religious symbol in core government buildings runs a special risk of 'mak[ing] religion relevant, in reality or public perception, to status in the political community'") (citation omitted). At best, *Allegheny* suggests that context is highly important in determining whether a religious display on public property contravenes the Establishment Clause.

Guidance in identifying the contextual factors relevant to this inquiry can be found in Supreme Court and Second Circuit decisions analyzing Establishment Clause issues raised by religious speech or expressive activity in public forums. In *Widmar,* the Court held that the Establishment Clause did not provide a compelling justification for the University's exclusion of registered religious groups from university facilities made generally available to other registered student groups. In reaching this conclusion, the Court found two factors "particularly relevant".

First, recognizing that access was not tantamount to endorsement, the *Widmar* Court reasoned that an open forum policy that extended to religious speakers did not confer "any imprimatur of state approval on religious sects or practices". 454 U.S. at 274, 102 S.Ct. at 276; 454 U.S. at 272 n. 10, 102 S.Ct. at 275 n. 10 ("by creating a forum the University does not thereby endorse or promote any of the particular ideas aired there"). Second, the Court noted that a forum's availability to a diverse and broad class of speakers ensured that advancing religion would not be the "primary effect" of a nondiscriminatory open-forum policy. 454 U.S. at 275, 102 S.Ct. at 277. At most, such a policy would provide mere "incidental" benefits to religion. 454 U.S. at 274, 102 S.Ct. at 276; *see Committee for Pub. Educ. v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2964, 37 L.Ed.2d 948 (1973) (religious organization's enjoyment of mere incidental benefits does not result in a primary advancement of religion).

The Supreme Court has reaffirmed *Widmar*'s reasoning in its recent decision in *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). In *Lamb's Chapel,* the Court held that school district's denial of a church group's request to use public school premises to show a religious-oriented film violated the First Amendment. The Court readily rejected the school district's Establishment Clause defense, stating that it had

no more trouble than did the *Widmar* Court in disposing of the claimed defense on the ground that the posited fears of an

Establishment Clause violation [were] unfounded. The showing of this film would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members. The District property had repeatedly been used by a wide variety of private organizations. Under these circumstances, as in *Widmar*, there would have been no realistic danger that the community would think that the District was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental. As in *Widmar*, ... permitting District property to be used to exhibit the film involved in this case would not have been an establishment of religion under the three-part test articulated in *Lemon v. Kurtzman.*

—— U.S. at ——, 113 S.Ct. at 2148.

Though *Widmar* and *Lamb's Chapel* involved live speakers, their reasoning applies equally to fixed religious displays in public forums, since their Establishment Clause analyses hinged on the attributes of the forum—i.e., the diversity of speakers granted access thereto and the perceptual parity accorded speech therein by reasonable observers—not the speaker. *See Chabad–Lubavitch of Ga.,* 5 F.3d at 1390–91 (applying public forum analysis outlined in *Widmar* to assess whether Establishment Clause provided compelling justification for state's refusal to allow religious group to erect a menorah in a limited public forum in core government building); *Kreisner,* 988 F.2d at 891–92, 894 (applying *Widmar* principles to determine whether San Diego violated Establishment Clause by permitting overtly religious holiday display in public park); *Americans United,* 980 F.2d at 1547–48, 1549 (applying *Widmar* equal access principle in determining that city did not violate Establishment Clause by permitting private group to erect fixed menorah display in traditional public forum); *McCreary,* 739 F.2d at 726 (applying *Widmar* public forum principles in determining that creche display in traditional public forum did not have primary effect of advancing religion). *But cf. Chabad–Lubavitch of Vt. v. City of Burlington,* 936 F.2d 109, 111 (2d Cir.1991) (situation in *Widmar* distinguishable from that posed by fixed display in traditional public forum because *Widmar* "involved an open forum, with live speakers, in a public university").

*Widmar* and *Lamb's Chapel* implicitly recognize that, in the mind of the reasonable observer, expressive activities in true public forums are symbolically linked to the public, not the government, and that religious speech in no way alters this deeply-rooted association. Quite the contrary, these decisions make clear that by permitting religious speech on a nondiscriminatory basis, government sends a message of neutrality, not endorsement. *See Mergens,* 496 U.S. at 248, 110 S.Ct. at 2371 (equal access policy sends a message "of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion").

For the reasonable observer, the private religious fixed display should be no different from other fixed displays erected by private speakers. This observer should understand that the public forum is the public's expressive playground, and that private speakers with a religious message, like any other member of the public, will resort to this forum to convey their particular messages. *Cf. Americans United,* 980 F.2d at 1548 ("public fora exist solely to provide a platform for speakers of all kinds"); *Kreisner,* 988 F.2d at 891 ("[r]eligious speakers have the same right of access to public forums as others"). The reasonable observer also knows that, unless otherwise stated, speech within these arena "belongs and can be attributed to the private speaker only; neither approbation nor condemnation of the private speaker's message may be imputed to the state". *Chabad–Lubavitch of Ga.,* 5 F.3d at 1392; *cf., Mergens,* 496 U.S. at 250, 110 S.Ct. at 2372 (failure to censor is not endorsement). Therefore, "[i]nstead of concluding that religious zealots have stormed the gates with the city's endorsement, the reasonable observer recognizes th[e] [religious] display as yet another example of free speech". *Americans United,* 980 F.2d at 1549.

In traditional public fora such as public parks, the absence of governmental sponsorship of private religious displays is strikingly clear. Intimately linked to the free interchange of ideas and traditionally the situs of a wide range of public expressive activity, public parks are viewed and must be viewed as the public's expressive domain. Expressive conduct in these classic public fora thus should be viewed by reasonable observers as that of members of the body politic, not the government. *See Kreisner,* 988 F.2d at 895 ("[i]t seems axiomatic to the public forum principle that we view messages expressed there as those of the actual speakers").

Hence, the existence or non-existence of accompanying secular symbols should be of little import to the reasonable observer viewing religious displays in these quintessential public forums. In rejecting the argument that a free-standing menorah display in a traditional public forum violates the Establishment Clause, the Sixth Circuit in *Americans United* reasoned:

[T]he assumption that the menorah constitutes only a religious symbol that remains after Chabad House has finished its speech ... is wrong; Chabad House's menorah display is no mere remnant of religious speech, it *is* religious speech and must receive the same respect as a round-the-clock Bible reading. It would be strange for a reasonable observer to find *more* endorsement in a menorah standing alone than in a menorah accompanied by a Torah reading or by crowds of people celebrating Chanukah with games or feasts. The menorah display constitutes religious speech just as much as a meeting of a school Bible Club ... Therefore, this case must be governed by ... *Widmar* ...

980 F.2d at 1549 (emphasis in original).

Thus, for the reasonable observer, the very nature of the forum itself, assuming no affirmative governmental sponsorship of the display, negates any impression of government endorsement of the display's religious message.

The Second Circuit's decision in *McCreary v. Stone* is illustrative. *McCreary* involved a First Amendment challenge to the city's denial of a religious group's application to dis-play a free-standing creche in a Scarsdale public park during the holiday season. Not unlike the City in this case, the Village of Scarsdale asserted that the Establishment Clause provided a compelling justification for its denial of the application. The Second Circuit rejected the Village's Establishment Clause defense, holding that "the Village's neutral accommodation ... to permit the display of a creche in a traditional public forum at virtually no expense to it cannot be viewed as a violation of the primary effect prong of the *Lemon* test." 739 F.2d at 726–27. Relying on *Widmar,* the *McCreary* court further held that the Village's pursuit of an equal access policy in this forum, that did not discriminate against religious speech, would not suggest government endorsement of religion. *Id.* at 727.

*McCreary* does not stand alone; in recent years, numerous courts have held that private free-standing religious displays in true public forums, open to the public for a wide array of expressive activities, do not contravene the Establishment Clause. *Chabad–Lubavitch of Ga.,* 5 F.3d at 1392 (no Establishment Clause issues implicated by state allowing religious group to erect menorah display in Rotunda of State Capitol since this arena was a true public forum); *Kreisner,* 988 F.2d at 898 (city does not violate Establishment Clause by permitting an overtly religious private display in a public park because park was a traditional public forum); *Americans United,* 980 F.2d at 1549 (privately funded menorah display erected during Chanukah in traditional public forum does not violate Establishment Clause); *see Small,* 964 F.2d at 619 ("mere presence of religious symbols in a public forum does not violate the Establishment Clause, since the government is not presumed to endorse every speaker it fails to censor in a quintessential public forum far removed from the seat of government").

Under the Supreme Court's public forum Establishment Clause jurisprudence and the Second Circuit's decision in *McCreary,* it is clear that the Establishment Clause does not proscribe private fixed religious displays in all public parks. The City's argument that the Second Circuit's decision in *Kaplan* es-

pouses a contrary rule is plainly wrong. In *Kaplan*, the Second Circuit held that a display of a privately-sponsored menorah conveyed a message of government endorsement because the forum at issue—City Hall Park—was closely associated with the seat of city government. 891 F.2d at 1029–30. This close perceptual nexus between the park and city government distinguished the case from *McCreary*. The *Kaplan* court expressly noted that "unlike *McCreary*, the park involved [was] not just any city park, but rather City Hall park." *Id.* at 1029.[14] Moreover, the menorah display in *Kaplan* "was located only some 60 feet away from the westerly steps of City Hall," such that from a certain vantage point, "the menorah appeared superimposed upon City Hall". *Id.* at 1029–30. *Kaplan*, therefore, does not hold that the Establishment Clause bars fixed religious displays in *all* public parks. Rather, *Kaplan* recognizes that, in rare instances, a public park may, in the mind of the public, be so intimately associated with the seat of government that it is viewed as a mere extension of the government. Thus, it is conceivable that private fixed religious displays in such parks could convey a mistaken impression of government sponsorship.

*Kaplan*'s narrow exception to the public forum rule does not save the Resolution, since the City has proffered no evidence suggesting that any, much less all, of its parks are closely associated with the seat of government. City Hall's mere visibility from certain areas of Tibbits and Main should not, in the mind of reasonable observers, associate these parks with City Hall. To the contrary, a reasonable observer understands, and should understand, that public spaces located near government buildings are prime free speech arenas. As the Ninth Circuit in *Kreisner* noted:

> [T]he proximity of buildings of unmistakably governmental character is a patently imperfect proxy for attributing speech that goes on there to the government. The White House, perhaps the most visible structural symbol of our government, bor-

ders Lafayette Square in Washington, D.C., yet the square has consistently been upheld as a public forum. Places that are near government buildings—where many people pass and have occasion to hear the speaker—are prime territory for the exercise of First Amendment rights.

988 F.2d at 894 (citations omitted).

Precisely because traditional public forums are at issue, the City's endorsement fears based on its claimed historic practice of not permitting fixed religious displays are unfounded. The reasonable observer attributes expressive conduct in these forums to private speakers not because of any governmental action or inaction, but because these settings are axiomatically the public's domain for expression. Moreover, here, the history of private fixed displays in City parks will buttress the private nature of any fixed religious displays in these forums. Indeed, in the context of contemporaneous private holiday tree displays in City parks, the private sponsorship of Rabbi Flamer's 1991 and 1992 proposed free-standing menorah displays in Tibbits during the eight days of Chanukah probably would have been obvious even to unreasonable observers. *See Americans United*, 980 F.2d at 1549 ("[i]n the mind's eye, the reasonable observer sees the menorah display as but one of a long series that has taken place since the [public forum] was opened"). Rabbi Flamer's proposed lighting ceremony, to be conducted by live speakers, would have merely underscored the private nature of the display.

Furthermore, the City's past unconstitutional infringements of free expression in denying permits for fixed religious displays certainly cannot constitute a compelling justification for a violation of the fundamental right of free speech. *See Travis*, 927 F.2d at 693 n. 3 (past denial of access to limited public forums to a religious group "would have been another act of discrimination rather than a justification for the denial" of access to other religious speakers). Nor can the absence of fixed religious displays in City

---

14. In a later decision involving the same park, the Second Circuit reiterated that *Kaplan*'s holding was based on the park's "close association with the seat of city government". *Chabad-Lu-* bavitch of Vt., 936 F.2d at 111–12. Significantly, this decision revealed that plaintiffs had been allowed to erect a menorah in another city park without objection. *Id.* at 111.

parks in the past; surely, Rabbi Flamer's ability to exercise his free speech rights does not depend upon whether others have chosen to exercise theirs.

 The Establishment Clause does not provide a compelling justification for the Resolution's content-based restrictions on expressive conduct. Yet, even if the Establishment Clause did provide such a compelling justification, the Resolution would still be void since it is not narrowly-tailored to achieve its asserted goal. The Resolution is overbroad in that it bans private fixed displays of political as well as religious symbols; clearly, no Establishment Clause concerns are raised by fixed political displays.

Moreover, the Resolution's prohibition of fixed religious displays is itself overbroad as other less restrictive means exist to dispel any mistaken impression of government endorsement.[15] For example, the City could post content neutral signs disclaiming endorsement of private fixed displays in City parks. *See McCreary*, 739 F.2d at 728 (a disclaimer sign accompanying creche display would "ensure that no reasonable person w[ould] draw an inference that the Village support[ed] any church, faith or religion associated with the display"); *cf. Allegheny*, 492 U.S. at 619, 109 S.Ct. at 3114–15 (presence of sign "further diminishes the possibility that the tree and the menorah will be interpreted as a dual endorsement of Christianity and Judaism.... [and] an 'explanatory plaque' may confirm that in particular contexts the government's association with a religious symbol does not represent the government's sponsorship of religious beliefs"). *But see Allegheny*, 492 U.S. at 619, 109 S.Ct. at 3114 (plurality opinion) ("no sign can disclaim an overwhelming message of endorsement"). I express no opinion as to the particular disclaimers, if any, the City may or should employ, but simply note that means short of a blanket exclusion of private fixed religious displays exist to resolve any public misperceptions.

Because the City would not contravene the Establishment Clause by neutrally permitting fixed religious displays in its parks, the Resolution is neither necessary nor narrowly tailored to achieve a compelling state interest. Since the Resolution, on its face, "violates the fundamental principle that a state regulation of speech should be content-neutral," *Widmar*, 454 U.S. at 277, 102 S.Ct. at 278, and the City has proffered no compelling state interest which the Resolution serves, I conclude that the Resolution is unconstitutional.[16]

The City, of course, retains the right to apply content-neutral regulations to private fixed displays in its parks, including restrictions on their size and location. In addition, the City may devise content-neutral policies applicable to certain parks. For example, if, as the City argued at trial, vandalism is a problem at Main, the City may employ any appropriate content-neutral restrictions on fixed displays at that park to address such problems. What the City may not do, however, is preclude a private speaker from erecting a fixed display of a religious symbol, free-standing or otherwise, in a City park on the basis of such display's religious message. Accordingly, the City may not deny Rabbi Flamer a permit to erect a fixed free-standing menorah in a City park during the Chanukah holiday because of the menorah's religious message.

## CONCLUSION

For the reasons discussed above, I declare the Resolution unconstitutional, and permanently enjoin the City from applying the Resolution to Rabbi Flamer's request to display free-standing menorah in a City park this Chanukah holiday, and in the future.

---

15. Even if the City's argument that the Establishment Clause only permitted combined religious and secular displays were correct, the City has not demonstrated that a combined holiday tree and menorah display is impossible in this case. The City has admitted that there is a grassy area in Tibbits which could accommodate a menorah display, and has not put forth any evidence suggesting that this spot could not also hold a holiday tree. Therefore, even under its own argument, the City has not offered a compelling justification for its blanket exclusion of fixed religious displays from all City parks.

16. Having concluded that the Resolution violates the Free Speech Clause, I need not consider Rabbi Flamer's other constitutional objections.

This Opinion and Order constitutes the final judgment of the Court.

**SO ORDERED.**