Karen **ADLER**, etc., et al., Plaintiffs,

v.

**DUVAL COUNTY SCHOOL BOARD,**
et al., Defendants,

and

Sharon **GREEN**, etc., et al.,
**Defendants–Intervenors.**

No. 93–833 Civ–J–10.

United States District Court,
M.D. Florida,
Jacksonville Division.

May 4, 1994.

William J. Sheppard, D. Gray Thomas, Sheppard & White, P.A., Jacksonville, FL, for plaintiffs.

Charles W. Arnold, Jr., General Counsel's Office, Jacksonville, FL, for Larry Zenke.

Stephen Michael Durden, Charles W. Arnold, Jr., General Counsel's Office, Jacksonville, FL, for Duval County School Bd., Don Buckley, Stan Jordan, Nancy Corwin, Bill Parker, Gwen Gibson, Gwendola Jones, Cheryl Donelan, Duval County Public School Dist., Dalton Epting.

James M. Henderson, Sr., Christian Advocates Serving Evangelism, Washington, DC, Jay Alan Sekulow, Jordan W. Lorence, John G. Stepanovich, American Center for Law and Justice, Washington, DC, Jeffrey Wood, Law Office of Jeffrey Wood, Jacksonville, FL, for Student Coalition for Free Speech, amicus.

Mitchell Adam Stone, Law Office of Mitchell A. Stone, Jacksonville, FL, for American Jewish Congress.

Mathew Duane Staver, Jeffery T. Kipi, Staver & Associates, Orlando, FL, for Sharon Green, Linda Muhlbauer, Linda Gaston, Rhonda Sellers, Brenda Mayerlen, Ronald Haws, Jacki Roerink, William Frederick Branham, Sr., Michael Lukaszewski.

### MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

HODGES, District Judge.

This is an action brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution in which the Plaintiffs claim that their rights under the Establishment Clause of the First Amendment have been violated by the Defendants. Specifically, the claim is that the Defendant school authorities have adopted a policy that permits prayer at graduation exercises in the public high schools of Duval County, Florida, and that such policy violates the First Amendment prohibition against the

establishment of religion by the state.[1]

The Plaintiffs constitute a group of graduating seniors and a parent of a graduating senior who brought this action in early June, 1993, to enjoin the Duval County Public School District from permitting religious invocations and benedictions at the 1993 public high school graduation ceremonies. The Plaintiffs also sought declaratory relief and damages. Another group of students was granted leave to intervene as Defendants, opposing the Plaintiffs' claims and asserting their own First Amendment right of free speech at graduation ceremonies.

On June 4, 1993, after a hearing in open court, I orally denied the Plaintiffs' motion for preliminary injunctive relief, finding that the Plaintiffs had failed to sustain their burden of demonstrating a substantial likelihood of success on the merits (Doc. 18).[2] A renewed motion for injunctive relief was also denied by written order entered the following week (Doc. 32), and the 1993 graduation ceremonies at the seventeen high schools within the Duval County school district were conducted under the School Board's policy which is the subject of the constitutional challenge made in this litigation. The case then proceeded through the discovery stage and is presently before the Court on the parties' cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Upon due consideration, I have determined that there is no genuine issue of material fact, that the case can be decided on the existing record as a matter of law pursuant to Rule 56, and that the Defendants are entitled to prevail on the constitutional issues presented.[3] It follows, for the reasons explained below, that the plaintiffs' motion for summary judgment will be denied, the Defendants' motion and that of the Intervenors will be granted, and final judgment will be entered accordingly.

## BACKGROUND

Shortly after the Duval County high school graduation ceremonies in early summer, 1992, the Supreme Court of the United States decided *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), holding that the Establishment Clause of the First Amendment is violated whenever school officials, as state actors, plan for and arrange the making of religious albeit "nonsectarian" prayer in the form of invocations and benedictions at high school graduation exercises. In response to that decision, Vicki R. Reynolds, the Duval County School Board's legal liaison, at the direction of Larry Zenke, Superintendent of Schools for the Duval County public schools, wrote a memorandum to all school principals in the county saying that "due to the recent Supreme Court Ruling in *Lee v. Weisman*, there should be no prayer, benediction, or invocation at any graduation ceremonies." Deposition of Larry Zenke, at 7–8 and at Exhibit 1. Thereafter, Superintendent Zenke received a number of letters suggesting that student-initiated and student-led prayer might be constitutional. Deposition of Larry Zenke, at 8–9. Accordingly, he directed Ms. Reynolds to further research the issue. *Id.* She later advised Superintendent Zenke that it would be appropriate for principals to allow student-initiated and student-led prayer during the graduation ceremony so long as the administration and faculty were not involved in the decision making process. *Id.* at 10–11. Accordingly, and again pursuant to Superin-

---

**1.** There is no dispute that jurisdiction exists under 28 U.S.C. § 1343(a)(3), or that the Defendants acted, and are acting, under color of state law within the meaning of that statute and 42 U.S.C. § 1983.

**2.** This decision was made largely on the authority of *Jones v. Clear Creek Independent School District*, 977 F.2d 963 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), a recently decided case on closely analogous facts favoring the position of the Defendants.

**3.** A pretrial conference was conducted on the record on April 18, 1994. All counsel agreed that there is no genuine issue of material fact. The only possible exception relates to the intention, motivation or purpose of the Defendants in pursuing the disputed policy. For the reasons stated later in the text, however, I have determined that this potential fact issue is not material; or, even if it was material, if one accepts the Plaintiffs' factual assertions on the point it would not change the result.

tendent Zenke's direction, Ms. Reynolds issued to all high school principals another memorandum dated May 5, 1993, entitled "Graduation Prayers" stating:

> You will recall that after the 1992 Supreme court case of *Lee v. Wiseman* [sic], you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at · graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not *student* initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.
>
> This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the *Lee v. Wiseman* [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:
>
> 1. The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;
>
> 2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;
>
> 3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board [sic], its officers or employees;
>
> The purpose of these guidelines is to allow the students to direct their own graduation message without monitoring or review by school officials.

Deposition of Larry Zenke, at Exhibit 3.

At a subsequent School Board meeting held on June 1, 1993, a motion was made to substitute a "moment of silence" for any student initiated messages that might otherwise be given pursuant to the guidelines or policy announced in Ms. Reynolds' memorandum of May 5. That motion failed by a vote of four to three; and, thus, while the Reynolds' memorandum of May 5 was not itself the subject of any specific vote by the Board, that memorandum was left in force with the acquiescence or tacit approval of the Board as its' official policy governing the 1993 commencement exercises. Moreover, it remains in effect and, unless altered by Defendants or enjoined by this Court, will govern the approaching ceremonies in 1994 as well.

With respect to the 1993 ceremonies conducted after this Court declined to enjoin implementation of the May 5 memorandum, the high school principals, in accordance with the guidelines established in the memorandum, delegated decision making authority to graduating senior students at each school, respectively, to determine whether student messages should be given at the opening and/or closing of the graduation exercises.[4] At ten of the seventeen high schools, it is undisputed that the students opted for messages that constituted various forms of religious prayer. At the remaining seven schools, however, it appears that either no messages were given at all, or that any that

---

4. At some of the schools, the decision was delegated to one or more of the senior class officers, or to a group of students who were in charge of the graduation ceremony. ·*See* Depositions of Dr. Dalton Epting, Principal, Mandarin High School, Doc. 95, at 17–19; Earlene T. Lockett, Principal, Ribault Senior High School, Doc. 100, at 11; James H. Jaxon, Principal, Terry Parker High School, Doc. 97, at 14; Ronell Poppel, Principal, Ed White High School, Doc. 102, at 18–20; David E. White, Principal, Wolfson High School, Doc. 105, at 27–28. At other schools, the entire senior class student body was involved in the decision making process. *See* Depositions of Steve Hite, Principal, Englewood High School, Doc. 96, at 18–20; Jimmy Johnson, Principal William Raines High School, Doc. 98, at 8; Dr. Larry Paulk, Principal Fletcher High School; Doc. 101, at 19; William L. Stone, Principal, First Coast High School, Doc. 104, at 16.

were given were entirely secular, having no religious aspects.

### THE PARTIES' CONTENTIONS

Plaintiffs move for summary judgment and argue that prayer during public school graduation ceremonies is *per se* unconstitutional regardless of the manner in which the decision to have prayer is made and how or by whom the prayer is presented. Plaintiffs argue that the primary purpose of the guidelines in the Reynolds' memorandum of May 5 was to advance religion. Plaintiffs also argue that delegating to the students the decision whether prayers are to be included in graduation exercises does not insulate Defendants from being "excessively entangled" with the religious aspect of the graduation ceremony.

Defendants also move for summary judgment and argue that the policy guidelines set out in the May 5 memorandum had a secular purpose; that any prayers delivered were student-initiated, student-written and student-delivered without monitoring or review by school officials; and therefore, the policy as implemented lacked the pervasive government involvement condemned in *Lee* and in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Defendants contend that the purpose of the guidelines was to provide direction to school principals concerning graduation messages without advancing or inhibiting religion in any official sense condemned by the Establishment Clause, and that allowing the students to decide whether and what type of speech to have at graduation does not excessively entangle the state with religion. Defendants and the Intervenors further assert the students' constitutionally protected right to freedom of expression at public high school graduations.

### DISCUSSION

The First Amendment's mandate that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" applies to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Pursuant to the Establishment Clause, the government may not aid one religion, aid all religions or favor one religion over another. *Everson v. Board of Education of Ewing Township*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). For the last twenty years, the United States Supreme Court has accomplished the often excruciating task of keeping government and religion apart by resorting to the three-pronged test set out in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). "First, the statute [or policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id.* at 612–13, 91 S.Ct. at 2111–12 (citations omitted). Failure to meet any one of these tests requires that the challenged statute or policy be stricken as violative of the Establishment Clause.

Last term, however, in deciding *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649 (1992), the Supreme Court did not engage in a *Lemon* analysis. Rather, the Supreme Court pursued a fact-sensitive "coercion" analysis. *Id.* at ——, 112 S.Ct. at 2660. The Court stated that it need not reconsider *Lemon* because of controlling precedents concerning prayer and religious exercise in primary and secondary schools pointing the way to resolution of the case before it without applying the *Lemon* test. *Id.* at ——, 112 S.Ct. at 2655.[5] The Supreme Court's failure to apply *Lemon* has led some courts to speculate on the stability of *Lemon* after *Lee. See, e.g., Sherman v. Community Consol. Sch. Dist. 21*, 980 F.2d 437, 445 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2439, 124 L.Ed.2d 658 (1993). In *Lamb's Chapel v. Center Moriches Union Free School District*, however, the Court specifically declared that *Lemon* "has not been overruled." —— U.S. ——, —— n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993).

---

**5.** The Supreme Court has decided Establishment Clause cases before *Lee* without relying on the *Lemon* test. *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984).

*See also Chabad–Lubavitch of Georgia v. Miller*, 5 F.3d 1383, 1388 (11th Cir.1993) (en banc). Accordingly, it is appropriate to engage in both a *Lemon* analysis and to apply the "coercion" test of *Lee*.

## A. *LEMON APPLICATION*

### 1. Secular Purpose

■ The Plaintiffs contend that the true purpose of the Reynold's memorandum of May 5 was to preserve and perpetuate prayer during graduation exercises. They contend that the guidelines set out in the memorandum were prepared and distributed only after pressure was brought to bear upon Superintendent Zenke and Ms. Reynolds to promulgate a policy accommodating prayer. They point especially to a letter to Ms. Reynolds from the pastor of the First Baptist Church stating that he is " 'fish'[ing] for ways to incorporate prayer in our graduation ceremonies." March 3, 1993 letter from Calvin J. Carr to Vicky Reynolds, Deposition of Vicky Reynolds, Doc. 103, at Exhibit 1. The Plaintiffs also point to statements made by three of the Defendants as members of the School Board at the meeting held on June 1, 1993, when the possible alternative of a moment of silence was rejected by a vote of the Board.[6]

The Defendants and the Intervenors contend, on the other hand, that the policy or guidelines announced in the May 5 memorandum had a primary secular purpose—namely, to safeguard the free speech rights of the participating students by permitting them, through a chosen representative of their own, to solemnize the occasion as a culminating educational experience (unlike periodic athletic events or student assemblies) by having a brief message at the beginning and/or the end of the program acknowledging and drawing attention to the unique, milestone nature of the event.

It is here that a potential issue of fact enters into the case if, in making an analysis under *Lemon*, the purpose of the policy is to be determined on the basis of the subjective motivations or intentions of the policy makers rather than the language of the policy itself, the historical setting in which it was conceived, and the manner in which it has been interpreted and applied. In this instance, however, I do not believe that any *material* fact issue exists.

■ First, especially where the law or policy under review is the result of an institutional process, such as a vote of a multi-member legislature, council or board rather than action taken by an individual decision maker, the purpose of the disputed law or policy should normally be discerned from the plain meaning of the words used; the official legislative history, if any; the manner in which the law or policy has been interpreted and applied (if such demonstrable experience is available); and, lastly, the general social condition or historical background which led up to the adoption of the law or policy. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566–68, 111 S.Ct. 2456, 2461, 115 L.Ed.2d 504 (1991); *Aldridge v. Williams*, 44 U.S. (3 How.) 8, 23, 11 L.Ed. 469 (1845); *Church of Scientology v. City of Clearwater*, 2 F.3d 1514, 1527 (11th Cir.1993). The individual, and quite possibly varied, purposes or intentions of the several operative decision makers, especially when those views are known only with respect to less than a majority of those voting or deciding, would have little or no probative value.

So, here, to the extent that the School Board was the institutional policy maker (rather than Superintendent Zenke and/or Ms. Reynolds) the purposes or intentions of the members of the Board are unknown. No debate was had and no vote was taken on the Reynolds memorandum of May 5. The discussion pointed to by the Plaintiffs had to do with an alternative proposal—the "moment of silence"—and the views that were expressed were those of three of the members, less than a majority. Furthermore, of those three, only one clearly expressed a preference for the retention of prayer as a board sanctioned activity.[7] In the circumstances of

---

**6.** See the Second Amended Complaint, Doc. 63, at 7–9, ¶ 19. See also n. 7 *infra*.

**7.** Specifically, School Board member Bill Parker stated:

> I cannot vote to allow our '93 graduating class to have a few minutes of silent meditation

this case, therefore, at least as far as the motivation or intent of the Board itself is concerned, I do not believe that there is any *material* dispute. The motivation or intent of the Board relative to the Reynolds memorandum of May 5 is essentially unknown; or, to the extent that the general views of three of the members were disclosed in public debate about a "moment of silence" (rather than the policy in dispute), that evidence is so attenuated as to have no probative value.[8]

Secondly, even if the Court should consider the individual motives or intentions of Superintendent Zenke and Ms. Reynolds, taking the sum of the evidence pointed to by the Plaintiffs together with the inferences to be drawn from that evidence, all in a light most favorable to the Plaintiffs' position in the case, the most that can be said is that Superintendent Zenke and Ms. Reynolds had a mixed motive or purpose: (a) to permit secular "graduation messages" by the students as a solemnization of the ceremony in lieu of the historical invocations and benedictions led by clergy; (b) to accommodate prayer or religious content in such student driven "graduation messages" if the students, independently of any involvement by school authorities, decided upon that course in the exercise of their own First Amendment right of free speech; or (c) to have neither secular messages of solemnization nor religious prayer if the students preferred that mode. There is,

therefore, no material dispute of fact concerning those motives; and, as can now be demonstrated as a matter of law, those motives are predominantly secular in nature for the purpose of the first prong of the *Lemon* test (requiring a secular governmental objective in enacting the law or policy in dispute).

While this case has been pending, the United States Court of Appeals for the Eleventh Circuit has rendered an important *en banc* decision concerning the Establishment Clause, the *Lemon* test, and the interrelationship of the Establishment Clause and the Free Speech Clause of the First Amendment. *Chabad–Lubavitch of Georgia v. Miller*, 5 F.3d 1383 (11th Cir.1993) (en banc). There the court considered the constitutionality of a refusal by the state of Georgia to permit display in the capital rotunda of a Chanukah menorah. The state contended that if it allowed the display it would violate the Establishment Clause, while the plaintiff asserted that no Establishment Clause violation would occur and that it had a First Amendment right of free speech to exhibit the display. The court began unraveling this constitutional puzzle by applying the *Lemon* test to decide whether the Establishment Clause would be violated if the state allowed exhibition of the menorah in the capital rotunda. The court held:

> Georgia would not violate the first prong of the [*Lemon* ] test because its neutral treat-

when we all know that in the past, someone has prayed out loud to thank the Lord· for the twelve great and successful years during this period of time. And now we want silence. . . . I think that our school principals should be allowed to work out a non-sectarian message with our student chaplains, or a guest minister, rabbi, or whatever would be acceptable to all at this very important time in our young people's lives. We need to tell everyone that our free public schools are the cornerstone of this republic and that we want to preserve this country and the things that made it great, that we are all here because of God. . . .
Second Amended Complaint, Doc. 63, at 8, ¶ 19.

8. Plaintiffs argue that *Jager v. Douglas County School Dist.*, 862 F.2d 824 (11th Cir.1989) compels this Court to closely scrutinize the *subjective* intent of the policy makers and to find, in this case, that the Board members were motivated by a religious purpose. *Jager*, however, is clearly distinguishable on its facts. *Jager* involved an Establishment Clause challenge to an "equal access" plan that would allow the giving of invoca-

tions prior to public high school football games. Judge Johnson specifically noted that the plan "stated that its purpose was to 'perpetuate and regulate the traditional invocation as part of the opening ceremonies of school athletic events.' " *Id.* at 827. No such statement of purpose is present here. Moreover, the Court doubts the precedential value of *Jager* in any event, *cf. Stough v. Crenshaw County Bd. of Educ.*, 744 F.2d 1479 (11th Cir.1984), because of the division of opinion among the members of the panel deciding the case. *Church of Scientology v. City of Clearwater, supra*, is similarly distinguishable on this point because of the nature and volume of the evidence available in that case concerning the motives by the city council in passing the disputed ordinance. *See* 2 F.3d at 1530–34. Moreover, neither *Jager* nor *Church of Scientology* involved countervailing rights of free speech in a limited public forum, a point critical to the correct constitutional resolution of this case as discussed *infra*.

ment of Chabad's display *would advance the secular purpose of providing an arena for its citizenry's exercise of the constitutional right to free speech. See Widmar [v. Vincent ]*, 454 U.S. at 271, 102 S.Ct. at 275 [70 L.Ed.2d 440] [ (1981) ] (noting with approval that the district and appellate courts held that "an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose"); *cf. Lynch [v. Donnelly ]*, 465 U.S. at 680, 104 S.Ct. at 1362 [79 L.Ed.2d 604] [ (1984) ] ("The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations.").

5 F.3d at 1389 (emphasis supplied). So, in this case, even though allowance of student-initiated and student-delivered messages may result in the giving of prayer in some graduation. exercises, that does not equate with a finding that the policy announced in the Reynolds' memorandum of May 5 was intended to promote religion. On the contrary, it's purpose was secular—to retain, if the graduating students so desired, the giving of messages to solemnize the occasion and to observe and protect the right of free speech of the students giving such messages. "[A] policy of treating religious speech the same as all other speech certainly serves a secular purpose." *Americans United For Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538, 1543 (6th Cir.1992) (en banc).

**2. Primary Effect**

 Plaintiffs next argue that the guidelines in the Reynolds' memorandum of May 5 have the primary effect of an advancement of religion by the state. They contend that allowing any prayer at a school sponsored event controlled by school officials leads to the inescapable conclusion that the school officials endorse and are advancing the establishment of religion in contravention of *Lemon's* second proscription.

Defendants and Intervenors contend, on the other hand, that the guidelines merely provide a mechanism whereby the *students* have the opportunity to decide whether or not to have a "graduation message" during commencement exercises, which constitute a limited public forum. The guidelines do not mandate, require, or direct that religious expression or prayer occur at any graduation ceremony. Indeed, the students may opt not to have a message at all or they may opt for a purely secular message. Accordingly, Defendants argue, the School Board itself has not advanced religion in any way, officially or otherwise.

Determining the primary effect of the guidelines in Reynold's May 5 memorandum is not particularly difficult. While, to be sure, the constitutionality of prayer at graduation ceremonies is the issue that prompted the issuance of the guidelines, the guidelines themselves are entirely neutral on the subject of prayer. The word is never mentioned, nor is there any inference, subtle or otherwise, that the students should opt for prayer in preference to a secular message or no message at all. Moreover, the neutrality of the guidelines in the understanding of those most affected by them was clearly demonstrated in the results they produced in 1993. While ten of the schools elected to have some form of prayer, as many as seven did not.[9] And finally, even in those schools having prayer, it was necessarily understood by all of the graduating students (even those opposed to it) that the prayer was the voluntary election of the students themselves—since they voted on the issue—and was not the result of any governmental policy or decision by the school authorities, i.e., was not the result of any "establishment" activity on

---

9. Invocations and benedictions have been traditional and are therefore familiar if not expected at high school graduation ceremonies. It is not surprising, therefore, that the graduating students at ten of the schools would opt in favor of continuing that practice at their own graduation exercises whether in the interest of tradition or in the interest of religious worship. This is espe-

cially true on the first occasion of having the issue decided by student choice. Indeed, if there is any surprise it lies in the election of the other seven schools not to have any prayer, and that result is of no aid to the Plaintiffs since they bear the burden of showing an "establishment" effect flowing from the challenged policy.

the part of the state within the meaning of the First Amendment.

*Lemon* only condemns government action that has the *primary* effect of advancing religion. 403 U.S. at 612, 91 S.Ct. at 2111. In summary, the guidelines in Reynolds' May 5 memorandum lack that primary effect in two distinct senses. First, unlike the display of the menorah in *Chabad–Lubavitch of Georgia,* which would always involve religious connotations, this is a stronger case for the Defendants because implementation of the guidelines may or may not result in prayer at all. There is no suggestion or incentive one way or the other, and the lone occasion on which the guidelines have been applied to date produced divided results. Secondly, even when prayer was given, it was not as a result of any creative or authoritarian "establishment" activity on the part of school authorities, and this was necessarily understood by those in attendance. "[T]o have forbidden 'effects' under *Lemon,* it must be fair to say that the government itself has advanced religion through its own activities and influence." *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987). That would not be fair to say in this case.

■ There is another reason here that the challenged policy would not have the primary effect of advancing religion. It lies in the fact that the public high school graduation ceremonies conducted by the Defendants are limited public fora within the meaning of the First Amendment's free speech jurisprudence. See *Perry Educ. Ass'n v. Perry Local Educator's Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983), and *Crowder v. Housing Auth. of City of Atlanta,* 990 F.2d 586, 590–91 (11th Cir.1993). Traditionally, the ceremonies are held at the coliseum, away from the school campuses, and virtually the entire program is given over to public speech making by the valedictorian and other leaders of the graduating class,

and by community leaders who are invited to give the principal commencement address.[10] In this instance, for example, the featured speaker at one of the graduation exercises in 1993 was none other than Chief Judge Gerald Bard Tjoflat of the United States Court of Appeals for the Eleventh Circuit. Deposition of Don Buckley, Doc. 93, at 93, lines 11–13. The speaker at another was the Honorable Tillie Fowler, United States House of Representatives, Fourth District of Florida. Deposition of Dalton Epting, Doc. 95, at Exhibit 2. I have no difficulty concluding, therefore, that the Duval County public school graduation ceremonies are designated, limited public fora. *See Brady v. Spang,* 957 F.2d 1108, 1120 (3d Cir.1992). With that decided, *Chabad–Lubavitch of Georgia* once again governs the outcome:

> The analysis that courts must bring to bear on the interplay between the Free Speech Clause and the Establishment Clause in the public forum context is somewhat curious in that the existence of the public forum initially implicates the Free Speech issue and ultimately determines the Establishment Clause issue. Once the state creates a public forum, it may only exclude a private party's religious speech within the forum—a content-based restriction on speech—if the exclusion survives strict scrutiny review, that is, if the restriction is narrowly tailored to serve a compelling state interest.
>
> In those public fora cases, the state—as it has here—will interpose as a compelling state interest the need to avoid a violation of the Establishment Clause and will argue that permitting the religious speech may send a constitutionally impermissible message of state endorsement. This might be true if the private party communicated the religious speech on government property that was not a *true* public forum. Precisely because the religious speech is communicated in a true public forum, however,

---

10. There is no evidence that any speeches given at graduation exercises in Duval County, whether by students or by others, have been subject to routine prior review or approval as to content; and, of course, the policy announced in the memorandum of May 5 expressly precludes such a requirement with respect to the brief opening or closing messages in lieu of the previous invocation or benediction.

the state, by definition, neither endorses nor disapproves of the speech.

.  .  .  .  .

Any perceived endorsement of religion in a true public forum is simply misperception; the Establishment Clause is not, in fact, violated. *Doe [v. Small],* 964 F.2d [611, 629 (7th Cir.1992) ] (Easterbrook, J., concurring) ("[R]eligious speech may not be excluded from public forums just because passersby misunderstand the public role.").

.  .  .  .  .

Giving full effect to the public forum doctrine does not elevate the Free Speech Clause above the Establishment Clause. The central Establishment Clause inquiry—whether Georgia endorses Judaism by permitting Chabad to display its menorah in the Rotunda—is resolved by reference to the Rotunda's status as a public forum. Because the Rotunda is a public forum, in which the speech of private parties does not enjoy the State's imprimatur, there is no Establishment Clause violation in the first instance to weigh against Chabad's rights under the Free Speech Clause. Courts that have found otherwise ... simply misunderstood the principles they sought to apply.

5 F.2d at 1393–94 and n. 17 (citations omitted).

### 3. Excessive Entanglement

■ Finally, Plaintiffs argue that because the public high school graduation exercises are sponsored by the School Board and held at government owned facilities controlled by Defendants, allowing graduation prayer at graduation ceremonies results inevitably in excessive entanglement of the public schools with religion in violation of *Lemon's* third prong.

The United States Supreme Court has only held state action unconstitutional where it has found *excessive* entanglement of governmental and religious institutions. "The entanglement prong of the *Lemon* test is properly limited to institutional entanglement." *Lynch,* 465 U.S. at 689, 104 S.Ct. at 1368 (O'Connor, J., concurring). By requiring that graduation messages be voted on by the students, and written and presented by a student volunteer, the guidelines effectively exclude institutional entanglement. Plaintiffs would have the Court find an excessive entanglement in this case because the graduation ceremonies are "closely school-controlled." For such supervision and control to be constitutionally significant, however, it must involve the challenged activity. That is, Plaintiffs must demonstrate some entanglement between the school and the prayer. There is none. Even in *Jones v. Clear Creek Independent School District,*[11] 977 F.2d 963 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), a case with analogous facts, the court did not find an excessive entanglement where the policy required *review* of the message by a faculty member. In this case, the students were given carte blanche to determine the content of the message and no review was required thereby relieving the institution of an "excessive entanglement." *See also Chabad–Lubavitch of Georgia,* 5 F.3d at 1389.

Accordingly, because the guidelines in Reynolds' May 5 memorandum have a predominantly secular purpose, do not have the primary effect of advancing or endorsing religion, and do not excessively entangle the schools and the School Board with religion, I find no violation of the Establishment Clause under *Lemon.*

### B. *LEE APPLICATION*

In *Lee v. Weisman,* the Supreme Court held that Robert E. Lee, a public school

---

11. In an earlier decision, and prior to the United States Supreme Court's ruling in *Lee v. Weisman,* the Fifth Circuit Court of Appeals applied the *Lemon* test and held that a Texas school district's resolution permitting public high school seniors to choose student volunteers to deliver nonsectarian, nonproselytizing invocations at their graduation ceremonies did not violate the Establishment Clause. *Jones v. Clear Creek,* 930 F.2d 416 (5th Cir.1991) (*Jones I*). Following appeal, the

Supreme Court granted certiorari, vacated the Fifth Circuit's judgment in *Jones I,* and remanded it for further consideration in light of *Lee. Jones v. Clear Creek Indep. Sch. Dist.,* 505 U.S. —, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). The opinion after remand is the one referred to in this Order. *Jones v. Clear Creek Independent School District,* 977 F.2d 963 (5th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993).

principal acting in accord with the policy of his school district, violated the Establishment Clause by inviting a member of the local clergy, Rabbi Leslie Gutterman, to deliver a nonsectarian, nonproselytizing invocation at his school's graduation ceremony. Instead of directly considering any of the *Lemon* prongs in invalidating the school district's policy in *Lee,* the Court analyzed the coercive effect of the principal's actions. That is, the Court determined that the principal *coerced* graduation attendees to join in a formal religious exercise. 505 U.S. at ——, 112 S.Ct. at 2655. In reaching its conclusion, the Court emphasized that the inquiry was a "delicate and fact-sensitive one." *Id.* at ——, 112 S.Ct. at 2661.

The facts that the Court found particularly troubling in *Lee* were summarized as follows:

> State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory....

*Id.* at ——, 112 S.Ct. at 2665. Thus, *Lee* identifies unconstitutional coercion when (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors. Applying this analysis to the facts in this case does not change the outcome as dictated by *Lemon.*

Here, the school principals exercise significantly less control than was found in *Lee.* In *Lee* the principal specifically decided that an invocation and a benediction should be given, and he decided that a particular religious leader would give it. The guidelines here, by contrast, do not solicit or mandate invocations or benedictions; they simply permit them if the students desire. Neither the principals nor the faculty have any avenue of reviewing the messages once composed, and the guidelines explicitly preclude anyone but a student volunteer from delivering the graduation message. Finally, and most significantly in terms of coercive effect, the participants clearly understand that the student messages are just that—student messages that are divorced entirely from any govern-mental or institutional sponsorship. This Court agrees with the Fifth Circuit's analysis in *Jones* that "the graduation prayers permitted by the [guidelines] place less psychological pressure on students than the prayers at issue in *Lee* because all students ... are aware that any prayers represent the will of their peers, who are less able to coerce participation than an authority figure from the state or clergy." 977 F.2d at 971.

Plaintiffs argue that allowing any type of prayer at graduation places an unconstitutionally impermissible amount of psychological pressure upon students to participate in religious exercises. To so hold, however, would constitute an unwarranted extension of *Lee.* The Court had the opportunity in *Lee* to ban all prayer at graduation ceremonies. Rather than focus upon and, indeed, emphasize the need for fact sensitivity, the Court could have stated that *any* prayer at public high school graduation ceremonies violates the Constitution under *any* circumstances. It did not do so. Or, the Court could have required that separate baccalaureate services be held in lieu of including invocations and/or benedictions in official graduation ceremonies. Again, the Court declined to so hold.

In light of the dictates of both *Lemon* and *Lee,* the Court finds that the Defendants' policy as announced in the Reynolds' memorandum of May 5, 1993 does not violate the Establishment Clause of the United States Constitution.

Accordingly, upon due consideration, Defendants' motion (Doc. 87) and Intervenors' motion (Doc. 85) for summary judgment are GRANTED and Plaintiffs' motion (Doc. 90) for summary judgment is DENIED. The Clerk is directed to enter judgment in favor of Defendants and Intervenors and against Plaintiffs.

IT IS SO ORDERED.

DONE and ORDERED.